552 A.2d 1311

**Robert E. HOLLOWAY**

v.

**FAW, CASSON & CO.**

**No. 228, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 6, 1989.

208

John B. Robins, IV (Leonard Bruce Wade and Robins & Johnson, on the brief), Salisbury, for appellant.

Sally D. Adkins (Fletcher P. Thompson, A. Gillis Allen, II and Adkins, Potts & Smethurst, on the brief), Salisbury, for appellee.

Argued before GILBERT, C.J., and BISHOP and GARRITY, JJ.

BISHOP, Judge.

Cross appellants, Faw, Casson & Co., Inc. ("Faw, Casson"), an accounting partnership, filed a complaint in the Circuit Court for Wicomico County seeking declaratory relief and damages against appellant, Robert E. Holloway, ("Holloway"), a former partner of that firm, for his alleged breach of the noncompetition clause contained in the Partnership Agreement (the "Agreement"). In his counter-claim Holloway requested a declaration that the covenant restricting competition was unenforceable and made a claim for money that the partnership owed him but withheld for his alleged breach of the noncompetition agreement. The circuit court ruled by way of summary judgment that the noncompetition clause was unreasonable as written; the court then modified the Agreement and ruled it enforceable as modified. At a later jury trial on the remaining claims the court granted judgment in favor of Faw, Casson as to liability on both the complaint and counter-complaint and the jury returned a verdict in favor of Faw, Casson for $75,655.90 plus prejudgment interest of $6,367.59.

## FACTS

Holloway was employed by Faw, Casson as an accountant in 1968 and in 1979 became a partner in the firm's Salisbury office. In 1981 he signed the "Partnership Agreement"

which is the subject of this litigation. That agreement provides in part: .

XI. COMPENSATION: SALARY ALLOWANCE

A. Partners shall be compensated for their services to the partnership in the following manner:

1. Partners shall be paid annual salaries which shall be established by the Executive Committee at the start of each fiscal year. Such salaries may be adjusted upward or downward by the Executive Committee throughout the year. This is the base salary.

. . . . .

XVII. CONTINUED INCOME PARTICIPATION [("CIP")]

Equal monthly continued income participation payments shall be made, without interest thereon, to a terminated partner for a period of ten years following the effective date of any termination. The aggregate amount, subject to adjustments as provided elsewhere in this agreement, of such continued income participation payments shall be an amount equal to the terminated partner's allocable share of the "fees" of the firm.

. . . . .

XXI. VOLUNTARY WITHDRAWAL

[a]ny partner withdrawing from the partnership voluntarily or involuntarily hereby covenants and agrees that he or she will not engage in the general practice of public accountancy or any of its allied branches, either individually or with any other person, firm or corporation, either directly or indirectly, at any place within a *forty-mile radius of any* of our offices for *a period of five* years from the date of such withdrawal. If, within these limits, the partner engages in the general practice of public accountancy or any of its allied branches either individually or with any other person, firm or corporation, he or she agrees to pay Faw, Casson or its successor, *100% of the prior year's fee for any clients that were Faw, Casson's who engage the services of the withdrawing partner*

*during the five-year period.* Any amounts due such partner under Item XVII shall be forfeited by such partner. However, such forfeited vested amounts will be used to offset payments above. If there is a balance due Faw, Casson & Co. after offsetting of vested amounts, the partner's individual capital account will be used to offset the balance. Any remaining balance will be secured by a note to Faw, Casson & Co. from the partner payable over a three year period.

In June, 1983 the Faw, Casson Executive Committee, pursuant to its authority under paragraph XI A.1. of the partnership agreement, approved partners' salaries for the fiscal year June 1983 to May 31, 1984. Later, in the fall of 1983, the committee exercised their revisory powers under the same paragraph and approved an adjustment in the salaries for partners in the firm's Salisbury office. Under the terms of the salary adjustment, partners in the Salisbury office were notified that their salaries would be reduced to the extent that profits in the Salisbury office fell below $150,000 for the fiscal year June, 1983 to May 31, 1984 and any such shortfall would be allocated by the Salisbury partners among themselves. Holloway protested this adjustment but his appeal to the partnership grievance committee was denied.

On December 3, 1984, nine months after the grievance committee denied his appeal, Holloway voluntarily left Faw, Casson and, in direct violation of the Agreement, began working for another accounting firm in Salisbury and servicing the partnership's former customers. From the time Holloway left Faw, Casson, until the trial date, three years later, Holloway serviced 165 former Faw, Casson customers. These customers had generated fees of $160,193 with Faw, Casson the year prior to their departures from Faw, Casson.[1]

---

1. Holloway earned $86,100 as a public accountant in 1986.

Pursuant to the terms of the Agreement, Faw, Casson forfeited Holloway's CIP (Continued Income Participation) benefits due him under part XVII and began withholding his capital account payments to offset payments due under part XXI of the agreement, the non competition clause.

## ISSUES

I. Whether the circuit court erred in finding five years to be an unreasonable period of restriction.

II. Whether, having determined the five years to be an unreasonable period of restriction, the circuit court erred when it modified the covenant to three years then proceeded to partially enforce the agreement to that extent.

III. Whether the agreement, even as rewritten by the circuit court, is unreasonable as to area and duration, imposes an excessive hardship on Holloway, and is injurious to the public interest.

IV. Whether, even as modified, the agreement contains an enforceable liquidated damage clause rather than an unenforceable penalty and forfeiture clause.

V. Whether the circuit court erred in ruling, as a matter of law and fact, that Faw, Casson had not breached the contract.

VI. Whether the circuit court properly excluded testimony offered by Holloway, attempting to establish the prior course of dealing between the partnership and the partners.

VII. Whether the trial court erred in ruling, as a matter of law, that Faw, Casson had not converted Holloway's partnership interest.

VIII. Whether the evidence was sufficient to justify an award of prejudgment interest.

## DISCUSSION

### I. & III.

*Validity of the Covenant*

The circuit court ruled on the parties' cross motions for partial summary judgment on the enforceability of part XXI

of the Agreement, the non competition clause, and found that: (1) Faw, Casson had a legally protectable business interest which justified the partners' attempts to protect the partnership business by way of a restrictive covenant in the partnership agreement. (2) The court held that it was unreasonable to prohibit a withdrawing partner from competing for five years after withdrawal; the court reduced this period to three years and held that restrictive period enforceable. (3) The court found that the restriction prohibiting ex-partners from servicing Faw, Casson's "clients" merely limited Holloway from servicing those clients who were serviced by Faw, Casson at the time Holloway was a partner, and the court held that this interpretation was valid and enforceable. (4) Lastly, the court interpreted the covenant against competing within 40 miles of "our offices" to apply to only those Faw, Casson offices which were open at the time Holloway left Faw, Casson, and the court found this interpretation of the 40 mile restriction enforceable. The parties have appealed the circuit court's rulings on each of these issues.

The Court of Appeals, in *Gill v. Computer Equipment Corp.*, 266 Md. 170, 292 A.2d 54 (1972), determined that judicial review of restrictive covenants in employment contracts requires the courts to balance the interests of the employer, employee, and the public in such agreements and protect these various interests as necessary:

> The general rule in Maryland, as in most jurisdictions, is that restrictive covenants in a contract of employment by which an employee as a part of his employment contract agrees not to engage in a competing business or vocation with that of his employer on leaving the employment will be sustained if [the employer can prove that [2]] the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of *the business of the employer* and do not

---

**2.** *See Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 1311 (1979).

impose undue hardship on *the employee* or disregard the *interest of the public.*

*Gill v. Computer Equipment Corp.*, 266 Md. at 180, 292 A.2d 54 (emphasis added); *see also Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 123–124, 225 A.2d 288 (1967). This rule requires that "a determination of enforceability ... be made based on the scope of each particular covenant itself, and, if that, on its face, is not too broad, the facts and circumstances of each case must be examined." *Millward v. Gerstung Int'l Sports*, 268 Md. 483, 488, 302 A.2d 14 (1973) (citing *Becker v. Bailey*, 268 Md. 93, 299 A.2d 835 (1973)). In making such an examination some of the factors which the court is to consider are:

> whether the restriction is reasonable in area and duration[;] the hardships its enforcement might impose on the employee[;] the interests of the public[;] and whether the employee sought to be enjoined[:] performs unique services, is soliciting customers, using trade secrets, assigned routes, customer lists, or is exploiting personal contacts established between the employee and his customers during his employment.

*Millward v. Gerstung Int'l Sports*, 268 Md. at 488, 302 A.2d 14.

We apply the process outlined in *Millward* to each of the circuit court's rulings on the agreement *sub judice* giving due regard to the three interests which the *Gill* decision requires the Court to consider: the employer's, the employee's, and the public's.

(1)

*Employer's Legally Protectable Interest*

As the circuit court apparently observed, the first logical step in reviewing a restrictive covenant is to consider whether the employer has any legally protectable interest in the agreement because, if the answer to this primary question is "no", no amount of restriction can be permitted. Holloway argues that a legally protectable employer's interest in the covenant *sub judice* is precluded by an adequate

consideration of the Agreement within the context of any one of the *Gill* interests and he poses three alternative arguments to support his position: the public interest in the accounting profession renders such agreements illegal *per se;* the employer has no legally protectable interest in this particular agreement; and finally, assuming that the employer has a legally protectable interest, that interest is outweighed by the employee's interest. We consider each of Holloway's arguments in turn.

(i) Public Interest: In the Maryland cases in which the public interest has been considered as a factor in determining the reasonableness of a restrictive covenant, the courts have limited their discussion of this issue to the public's interest in free and open trade. *See, e.g., Ruhl v. Bartlett Tree Co.,* 245 Md. at 127, 225 A.2d 288 (stating that "no danger of monopoly is apparent"); *Tuttle v. Riggs–Warfield–Roloson,* 251 Md. 45, 49–50, 246 A.2d 588 (1968) (public interest not discussed); *Tawney v. Mutual System of Md.,* 186 Md. 508, 521, 47 A.2d 372 (1946) (concluding that the public interest was offended because "enforcing the clause ... would be to stifle competition in a field where the existence of competition is clearly in the public interest"). Holloway argues that, in the case of certified public accountants, at least, the public interest goes beyond free trade and a healthy competitive drive. He asserts that the public has a paramount interest in dealing with accountants of their choice, unbridled by the contractual limitations of third party contracts and that restrictive covenants in accountants employment contracts are therefore unlawful *per se.*

Holloway likens the accountant/client relationship to that of the attorney and client relationship which is protected from the interference of restrictive covenants by Rule 5.6(a) of the Rules of Professional Conduct.[3] We find considera-

---

3. Rule 5.6(a) states that

 A lawyer shall not participate in offering or making:

ble merit in this argument as the analogy between the two relationships is supported by § 9–110 of the Courts Article which provides for an accountant/client privilege and codifies "a strong public policy in favor of the protection of accountant-client communications." *Hare v. Family Publications Service, Inc.*, 334 F.Supp. 953, 961 (D.Md.1971). Nevertheless, because, unlike the case of attorneys, there is no absolute prohibition on such agreements in the accountant profession, we must consider this issue more fully.

Numerous other jurisdictions have addressed the issue of the impact of the public interest on restrictive covenants in accountants' employment contracts. At least one state has absolutely refused to enforce any type of restrictive covenant in these agreements. *See Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 297 S.E.2d 473, 475 (1982) (stating that such an agreement "unreasonably impacts on . . . the public ability to choose the professional services it prefers"). Other states, while not adopting a *per se* exclusion of such covenants, have given the public's interest in accountant/client relationships considerable weight in balancing the public's v. the employer's interests. *See, e.g., Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 406 A.2d 1310, 15 A.L.R. 4th 551, 558 (1979); *Mailman, Ross, Toyes & Shapiro v. Edelson*, 183 N.J.Super. 434, 444 A.2d 75 (Super.Ch.1982). For example, in *Edelson*, the court noted that:

> Accountants are not commercial business people. . . . Accountants, like doctors and lawyers, are engaged in a profession which necessarily requires clients to reveal personal and confidential information to them in the course of the professional relationship. Like the lawyer-client relationship . . . the accountant-client relationship is also consensual and fiduciary, and the right of the client to repose confidence in the accountant of his or her choice

---

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; . . .

should not readily be circumscribed. It is this distinction between restrictive covenants in a commercial or business setting, where primarily economic interests are at stake, and those binding professionals who depend largely on unconditional confidential relationships to serve their clients satisfactorily, which underscores the greater degree of injury to the public that may occur in the latter instance.

*Id.* 444 A.2d at 80. Still other jurisdictions have refused to afford the accountant/client relationship any extra-ordinary considerations beyond that given to any other type of business relationship. *See Faw, Casson & Co. v. Cranston,* 375 A.2d 463, 468 (Del.Ch.1977).

We agree with Holloway that, based upon the legislative intent behind § 9–110, the accountant/client relationship is deserving of exceptional considerations in this State. Unlike Delaware,[4] the Maryland Legislature has determined that this relationship deserves special protections and therefore the *Cranston* case is not applicable. Furthermore, the accountant/client relationship is more exceptional than that of other professions the Court has considered in this context. *See, e.g., Ruhl v. Bartlett Tree Co.,* 245 Md. 118, 225 A.2d 288 (1967) (the tree care taker/customer); *Tawney v. Mutual Systems of Md.,* 186 Md. 508, 47 A.2d 372 (1946) (insurance salesman/customer). Nevertheless, we do not agree with the Georgia Court and Holloway that restrictive covenants in this area are *per se* unreasonable.[5] The record reflects that such agreements are widespread in the accounting profession and, unlike the legal profession, the use of such agreements has not been specifically prohibited.

(ii) Employer's Interests: The employer, Faw, Casson, does not lack a legitimate business interest in the agreement.

---

4. Delaware Code Annotated Title 10, Chapter 43, which provides for privileged communications, does not include an accountant/client privilege.

5. But see p. 226 *infra,* n. 7.

Faw, Casson's only legally protectable interest in requiring its employees to sign a non competition agreement is to protect the employer's business by restraining those former employees whose duties involved the "creation of the good will of customers and clients which [clients] are likely to follow the person of the former employee."[6] *Silver v. Goldberger*, 231 Md. 1, 7, 188 A.2d 155 (1963); *see also Gill*, 266 Md. at 180, 292 A.2d 54; *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 225 A.2d 288 (1967). As a public accountant with Faw, Casson, Holloway's position easily qualifies under the *Silver* test. Holloway's job entailed substantial personal contact with clients who were likely to develop strong business and personal ties to Holloway rather than to the impersonal partnership entity. Contrary to Holloway's assertions, this case is not like those in which the Court disallowed such restrictions because the former employee posed no greater threat to the former employer than any other efficient competitor. *See, e.g., Budget Rent A Car v. Raab*, 268 Md. 478, 302 A.2d 11 (1973) (covenant against competition which was otherwise reasonable was held unenforceable where the employee was "an unskilled worker whose services ... [were] not unique; there was no solicitation of customers; nor was there any use of trade secrets, assigned routes, customer lists or development of personal contacts with customers as an integral part of the service rendered.") Holloway's duties "brought him into a direct and continuous relationship with [Faw, Casson's] customers", *Ruhl v. Bartlett Tree Co.*, 245 Md. at 124, 225 A.2d 288, and under these circumstances, Faw, Casson has an interest which is legally protectable through a reasonable employee non competition agreement. *See id.* at 124, 225 A.2d 288; *see also, Faw, Casson & Co. v. Cranston*, 375 A.2d 463 (Del.Ch.1977).

---

**6.** We do not consider here those cases involving the protection of trade secrets or the sale of the good will of a business. *See Tabs Associates v. Brohawn*, 59 Md.App. 330, 336–337, 475 A.2d 1203 (1984).

(iii) Employee's Interest: We also reject Holloway's contention that a restrictive covenant would, under any circumstances, be an unreasonable burden on a public accountant. It is true that, as Holloway contends:

> Even though the employer has a legitimate interest in the protection of its clientele, the restrictive covenant will not be enforced if under all the circumstances the covenant is unduly restrictive of the employee's freedom. "[T]he right to labor or use one's skill, talents, or experience for one's own benefit, or furnish them to another for compensation, is a natural and inherent right of the individual...."

*Ruhl v. Bartlett Tree Co.,* 245 Md. at 126, 225 A.2d 288 (citation omitted). However, for professional employees, like Holloway, the courts have found the burden of noncompetition clauses to be minimal due to the employee's ability to easily locate employment that is in conformity with the covenant restrictions. *See, e.g., Warfield v. Booth,* 33 Md. 63 (1870) (doctors); *Tawney v. Mutual Systems of Md., Inc.,* 186 Md. 508, 47 A.2d 372 (1946) (manager of a loan office); *Faw, Casson & Co. v. Cranston,* 375 A.2d 463 (Del.Ch.1977) (public accountant). Certainly, Holloway's circumstances under the agreement as modified by the circuit court are significantly better than those of the employees in *Ruhl v. Bartlett Tree Co.* where the Court upheld a two year, six county prohibition against Ruhl who had only a high school education and whose only training was in the tree-care business. While we agree that the covenant imposes a major inconvenience on Holloway, in comparison with the employees' circumstances in the cases cited, *supra,* the agreement *sub judice* as modified does not impose on Holloway a burden so extreme as to be unreasonable *per se.*

■ Having concluded that the circuit court was correct, that Faw, Casson does have an interest which is legally protectable by way of a non competition agreement, we must now consider whether the circuit court correctly applied the standards for such agreements from *Gill, Ruhl,*

and *Millward,* to the restrictions imposed by the agreement *sub judice.*

### (2)

### *The Time Restriction*

■ In *Tawney v. Mutual System of Md.,* the Court struck down a restrictive covenant in a bank manager's employment contract which restricted competition in Baltimore City for a period of two years from the date of termination of the employment. The Court reasoned that "it is sought to enforce a restriction beyond the time when new employees might reasonably become acquainted with existing customers...." *Id.* [186 Md.] at 521, 47 A.2d 372. The trial court in the case *sub judice* concluded, and we agree, that the agreement between the parties, in so far as it restricts competition by Holloway for a full five year period, suffers the same defect as the agreement in *Tawney;* it goes beyond the limits of what is reasonably necessary to protect the employer's legally protectable business interests.

Faw, Casson attempts to justify the five year time constraint, *sub judice,* as that period of time required to break the bonds between the former employee and the customers with whom he has dealt. It is interesting to note, however, that in the partnership agreement which preceded the 1981 Agreement the noncompetition clause was limited to three years and this provision was increased to five years in the 1981 agreement. Faw, Casson does not dispute that the original three year period was a reasonable time for partnership purposes, but merely claims that five years is better. The only concrete explanation offered in the record for the increase is that the capital accounts are being paid out to ex-partners over five years and the firm decided to "conform the same thing with the covenant for five years." Apparently the two year increase resulted from the partnership's endeavor to squeeze all possible restraints out of the noncompetition agreement. No explanation was provided for the fact that those promoted to the position of manager

were required to agree to a three year noncompetition agreement. We agree with the circuit court that there is "really no basis for any differentiation between the partner and the manager." The additional two years then do not appear to us to be intended as a shield to protect the employer from the unfair competition by the former employee, but rather, it appears to be intended as a sword to defeat the efficient competitor. This is not a legally protectable business purpose, *Silver v. Goldberger*, 231 Md. at 7, 188 A.2d 155. We affirm the decision of the circuit court that the restriction is unenforceable to the extent it exceeds three years.

In addition, we have difficulty extending this restrictive period beyond the three years because Faw, Casson has not met their burden of explaining how any client who has gone through the difficulty of forging a new professional relationship with another Faw, Casson accountant would bother to forsake those efforts in order to re-establish ties with Holloway. If such a double switch were worth the effort and expense it would surely not be as a result of any personal relationship forged with Holloway while the later was employed by Faw, Casson; rather, it would be due to Holloway's competitive efficiency and that efficiency is not a legitimate target for a restrictive covenant. *Silver v. Goldberger*, 231 Md. at 7, 188 A.2d 155.

(3)

*Restrictions on Dealings with Former Clients*

■ We also find unreasonable that portion of the agreement, approved by the circuit court, which restricts Holloway from engaging *any* former clients of the firm, regardless of whether Holloway himself actually dealt with those clients during his employment with Faw, Casson. Under the facts of *this* case, this restriction supports no legally protectable partnership interest and it imposes an excessive burden on the important public interest in dealing with the accountant of choice.

Even as limited by the circuit court's interpretation, to those clients engaged by Faw, Casson during Holloway's employment, this restriction still unnecessarily limits Holloway's dealings with thousands of potential clients. Considering the size of the partnership, with its offices in Easton and Ocean City, Maryland, and Dover, Rehobeth and Milford, Delaware and Holloway's sole location in the Salisbury office, it is highly unlikely that Holloway would be able to take advantage of the personal relations he forged during his employment with Faw, Casson in Salisbury were he to engage clients associated with those Faw, Casson offices with which Holloway had no contact during the period of his employment. In such instances Holloway could do "... no more than become an efficient competitor of his former employer...." *Silver v. Goldberger*, 231 Md. at 7, 188 A.2d 155, and this is not a proper target of a restrictive covenant.

As Faw, Casson points out, broad prohibitions on competition which restrict the former employee from dealing with customers or potential customers of the employer have been upheld; however, this has been done only where necessary for the employer's protection under the particular facts of each case. For example, in the so called "route cases" the Court upheld absolute restrictions along a route or defined sales area because exclusion from "that area is only a means of preventing the use of *the lists* of customers." *Tawney v. Mutual Systems of Maryland*, 186 Md. at 521, 47 A.2d 372. *See, e.g., Deuerling v. City Baking Co.*, 155 Md. 280, 141 A. 542 (1928) (3 months restriction on solicitation of anyone on the route during last six months of employment); *Tolman Laundry v. Walter*, 171 Md. 7, 187 A. 836 (1936) (no solicitation of route customers for one year after employment termination). These cases are distinguishable, though, from those cases, such as the one *sub judice*, in which other less restrictive means short of an absolute prohibition are available for insuring that the employee does not take advantage of the former employer's confidences. In *Tawney*, the Court distinguished the route

cases and held a general restriction invalid as applied to the manager of a small loan company where the agreement provided for the employee "to refrain from engaging directly or indirectly in any business competitive with that of the employer in the Baltimore City trading area for a period of two years." *Tawney*, 186 Md. at 511, 47 A.2d 327. The Court stated that "we think this goes beyond what is necessary to protect the good will of the employer...." *Tawney*, 186 Md. at 521, 47 A.2d 327.

In an effort to persuade us that the Court has adopted a *per se* acceptance of all absolute restrictions on dealings with the employer's former customers, Faw, Casson cites several more non "route" cases in which the Court of Appeals did enforce broad employee noncompetition agreements which agreements provided for general restrictions against all dealings with *any* former customers of the former employer. *See, e.g., Tuttle v. Riggs–Warfield–Roloson*, 251 Md. 45, 246 A.2d 588 (1968); *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 225 A.2d 288 (1966); and *Millward v. Gerstung Int'l Sports*, 268 Md. 483, 302 A.2d 14 (1973). But again, each of the cases cited by Faw, Casson is distinguishable from the case *sub judice* because, like the route cases, in each of the cases cited by Faw, Casson the factual situation justified the full enforcement of the rather severe restrictions on the former employees.

*Tuttle* involved an employment contract which restricted the employee, Tuttle, from dealing with any customers of the former employer for a period of two years after termination of employment; however, the employer's sole allegation of a breach of the agreement by Tuttle was his solicitation of a single major account which Tuttle had himself personally handled on behalf of his former employer. Similarly, in *Ruhl*, where the Court upheld a restriction on all competition in a six county area for two years after employment, the Court noted that "the area involved is that which Ruhl actively worked for Bartlett [ (the former employer) ] during his employment." *Ruhl*, 245 Md. at 128, 225 A.2d 288. Again, in *Millward*, the Court's approval of the ex-

tremely broad restrictive covenant also reflects the factual situation of that particular case. The employer in that case, Gerstung, operated a unique physical education camp for children. Millward, a very prominent sports figure was hired for his publicity value to teach at the camp. As part of the employment contract Millward signed the following agreement:

> "[Millward] also agrees that he will not for a period of two (2) years after termination of this Agreement ..., directly or indirectly, engage in the same or similar business, namely Gerstung Inter–Sport activities, physical education or sport instructions of any kind in the City of Baltimore or the surrounding counties where programs of the School are conducted, either individually or as a member or a firm or as a stockholder in a corporation. He further agrees never to solicit, directly or indirectly, divert or take away any of the patronage of the School."

*Millward,* 268 Md. at 484–485, 302 A.2d 14. Four years after he started with Gerstung, Millward left the camp and in a clear violation of the parties' agreement he became director of a new camp, Sports Camp, Inc.. This new camp, located very close to Gerstung's camp, drew from the same clientele and offered similar services. Sports Camp also copied Gerstung's fee schedule and mailed out advertising brochures one month prior to the date on which Millward knew that Gerstung would be mailing his circulars. The brochure prominently displayed a picture of Millward and advertized him as the camp director. In upholding the broad two year covenant against competition the Court explained:

> An important factor here which dictates our decision is the uniqueness of Millward's reputation and qualifications which had a direct bearing on the services he rendered for the appellee. It was because of this uniqueness he was first hired and his attributes and accomplishments were widely publicized and emphasized by Gerstung, Inc.... An additional factor here is that through

his position with Gerstung, Inc., Millward was able to establish personal contacts with students who were potential campers, their parents, and other in the field. He became known in the competitive field of day camp operation and established contacts that were essential if the new camp was to succeed. Finally, ... we cannot overlook the effect appellant's affiliation with Sports Camps, Inc. would have on his former students and campers with whom Millward had close personal contact.

*Millward,* 268 Md. at 489, 302 A.2d 14.

Each of these cases demonstrates the Court's application of the second half of the rule summarized in *Millward* that "a determination of the enforceability [of covenants against competition] should be made based on the scope of each particular covenant itself, and, if that, on its face, is not too broad, the *facts and circumstances of each case must be examined.*" *Millward,* 268 Md. at 488, 302 A.2d 14 (citations omitted, emphasis added). Similarly, in the case *sub judice,* we do not hold that a covenant identical to the one now before the Court could never be upheld on its face. We merely hold that, under the facts of this particular case, the severity of the restriction against servicing *any* of the employers former clients was unjustifiable for the purpose of protecting the employer.

Our decision on this issue is supported by the Supreme Court of Georgia which, in deciding a case involving a contract similar to the one now before this Court and also in the context of a public accountant's employment contract, concluded that:

[T]his covenant is unreasonable "considering the business interest of the employer sought to be protected" because it prohibits Singer from working for clients of HAW [ (the accounting partnership) ] for whom he did not perform services while at HAW. Without the benefit of the trust and confidence built up through the professional-client relationship, Singer does not have the ability to unduly

influence clients for his own benefit;.... [7]

*Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 297 S.E.2d 473 (1982) (2 year restrictive covenant). *But see Wolf & Co. v. Waldron*, 51 Ill.App.3d 239, 9 Ill.Dec. 346, 366 N.E.2d 603 (1977); *Ebbeskotte v. Tyler*, 127 Ind.App. 433, 142 N.E.2d 905 (1957); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463 (Del.Ch.1977) (upheld absolute bar against all competition by former partner to the accounting firm).

We hold that, in the case *sub judice*, the partnership agreement is unreasonable to the extent that it prohibits the employee from soliciting the business of those clients of the partnership with whom the former employee did not himself have direct contact while employed by the partnership. In so doing, we go beyond the limits imposed by the circuit court which merely required the clients to have been serviced by the partnership itself while Holloway was a partner.

(4)

*Restricting Competition Within 40 Miles*

Holloway claims that the limit on competition within 40 miles of any Faw, Casson office is an unreasonable restraint because, if enforced by way of an injunction, it would, in effect, preclude him from practicing as a public accountant anywhere in the State of Delaware or on the Eastern shore of Maryland. He contends that although the Agreement itself is silent on the issue of injunctive relief, and despite the fact that Faw, Casson has not requested an injunction, such relief is nevertheless available and the mere availability of an injunction renders the Agreement unreasonable.

---

7. Although we have rejected the reasoning of the Georgia Court that held this language to be unreasonable *per se, see,* pp. 216–217, infra and n. 5, we do regard as persuasive the rationale of that court in finding unreasonable the specific language involved in that case and, *ipso facto,* we apply that reasoning here.

Faw, Casson does not dispute, or could they properly do so,[8] Holloway's contention that it is sufficient that unreasonable restraints are available in an agreement and the employer need not actually seek unreasonable relief in order for the courts to strike down the potentially unreasonable part of a restrictive covenant. Faw, Casson's position is that injunctive relief is simply not available under this particular Agreement. They argue that the clear intent of the parties, as shown by the liquidated damages clause, is to permit Holloway either to suffer the restrictions under the Agreement or to pay the specific amount provided under the liquidated damages clause and avoid the restrictions. In other words, the Agreement gives Holloway an alternative to either perform or not perform and Faw, Casson's remedy for nonperformance is restricted to that provided in the liquidated damages clause which does not include injunctive relief. Faw, Casson rightly contends that if their interpretation is correct, that injunctive relief is not available, then under the agreement as modified by the Court the 40 mile provision is not a restriction on Holloway at all. This is so because we have already determined, *supra* at (2), that Faw, Casson may restrain, without regard to geographic restrictions, Holloway's solicitation of former partnership clients with whom Holloway had direct contact while a partner; therefore, the 40 miles clause, as interpreted by Faw, Casson, is actually a limit on Faw, Casson rather than Holloway.[9] If, however, Holloway's interpretation is correct, that injunctive relief is available to Faw, Casson despite the liquidated damages clause, then the 40 mile restriction is unreasonable because, as noted, *supra*, at

8. "[A] determination of enforceability [of a covenant against competition] should be based on the scope of each particular covenant itself, and, if that, on its face, is too broad, the facts and circumstances of each case must be examined." *Millward v. Gerstung Int'l Sport,* 268 Md. at 488, 302 A.2d 14 (citations omitted).

9. Of course, this interpretation also means that Holloway may conduct a public accounting business within that area and deal with those clients of Faw, Casson with whom he had no contact and with all others who may come to him for his services.

(2), Faw, Casson has no legitimate interest in any restrictions on Holloway's ability to service anyone other than those former Faw, Casson customers with whom Holloway had prior personal contact.

Thus, the issue for decision here is whether the inclusion of the liquidated damages clause in the partnership agreement forecloses the partnership's right to seek specific performance in the event that the employee practices within the restricted area. The only case in this State dealing with this precise issue in the context of an employment agreement is *Hahn v. Concordia Society*, 42 Md. 460 (1875). *Hahn* involved an employment contract between an actor and the Society. The contract provided that "if the defendant should break this engagement ..., he obligates himself to pay to the complainants a *conventional fine* of $200, which sum is forfeited by any violation of the contract...." *Id.* at 463 (Emphasis in original). The Court denied the Society's request for an injunction following Hahn's breach because the language of the Agreement, particularly the naming of a specific sum as liquidated damages, showed that the parties *intended* to preclude injunctive relief and therefore, must have intended to give the employee the option of nonperformance:

> The complainants have here exacted, and the defendant has given, a stipulation to pay a *specific sum* as *liquidated damages* for *any violation* of the contract, including as well a breach of the negative, as the non-performance of the positive and affirmative parts of it. The parties themselves have therefore settled the question and amount of damages resulting from a breach of this negative stipulation in the contract, and the complainants are not left "to the mere chance of any damages which a jury may choose to give." Having thus by their own contract, made presumably with full knowledge of the means and ability of the defendant, and having fixed by their own estimate the extent of injury they would suffer from a non-observance of this condition, and having indicated as clearly as if so stated in terms, that the only

form in which they could seek redress and recover the stipulated penalty or forfeiture, was a court of law, the complainants are precluded from now resorting to a Court of Equity for relief by way of injunction.

*Id.* at 465–466 (Emphasis in original).

In *Rogers v. Dorrance,* 140 Md. 419, 427, 428, 117 A. 564 (1922), a case involving nonperformance of a land sales contract, the Court in ordering specific performance distinguished *Hahn* on the basis that the wording of the liquidated damages clause in *Rogers,* as evidenced by the lack of any specified amount, revealed that the parties did not *intend* to give an option of nonperformance:

> It will be seen that *no definite sum or amount was fixed* or *named in the forfeiture clause* in this case [ (Rogers) ], *nor was it known what payments would be made before a breach of the contract.* The provisions of the forfeiture clause were: "If for any reason, the parties of the second part shall fail in any particular to perform the covenants, conditions and stipulations herein expressed, on their part to be performed, within the time specified, ... then all sums paid on account of said purchase money and all buildings erected on the above described property and all crops planted thereon shall be forfeited and retained by the said vendors as liquidated damages for the breach thereof, and this contract shall be void."

*Id.* at 428, 117 A. 564 (emphasis added).

The Court's focus in both *Hahn* and *Rogers* on enforcing the intent of the parties as discerned in part by the absence of any "definite sum or fixed amount" in the damages clause was also adopted by the authors of 71 Am.Jur.2d, Specific Performance, § 57 (1973), who note that:

> [T]he view taken by the great preponderance of authority among the cases is that the right to specific performance is ... to be determined ... by *whether the provision was intended merely as security for performance of the contract or as an alternative to the main obligation,* giving the party against whom the relief is sought the

option either to perform the main obligation or to pay or forfeit the penalty or liquidated sum. Whenever it appears that the intention of the parties was that the contract should be performed and that a stipulation for liquidated damages or a penalty was inserted merely as a security for such performance, then the contract will be specifically enforced notwithstanding the contract is alternative in form. *Generally speaking, it is only where the contract stipulates for one of two things in the alternative—the performance of certain acts or the payment of a certain amount of money in lieu thereof—that equity will not decree a specific performance of the first alternative.*

71 Am.Jur.2d Specific Performance, § 57 at p. 83 (quoted with approval in *Miller v. U.S. Naval Institute*, 47 Md.App. 426, 429, 423 A.2d 283 (1980) (emphasis added).

 The Court's decision 113 years ago in *Hahn* being in substantial conformity with the modern view, as explained in 71 Am.Jur.2d § 57, is still the law. Applying this standard to the case *sub judice*, we find that the remedy of specific performance by way of injunctive relief is not available under the terms of the partnership agreement. As in *Hahn*, the contract *sub judice* provides for a specific amount to be paid and, unlike the situation in *Rogers*, that amount was both specific and readily discernible prior to the employee's decision not to perform. The parties' apparent intent in drafting the clause *sub judice* was to provide an alternative to the main obligation of noncompetition and not to provide security for performance. Accordingly, the 40 mile restriction in this particular Agreement is a reasonable restraint.

## II.

### *Modification of the Non–Competition Clause*

Holloway contends that, after the circuit court properly found the five year restriction on competition to be unreasonable, the court erred in attempting to reduce that period

to one of reasonable duration. He claims that the court's power in this area was limited to upholding the agreement as written, enforcing the agreement minus severable portions, or striking down the *entire* agreement. The courts may not, he asserts, "redraft unenforceable agreements to render them enforceable."

The typical response in the reported appellate decisions in this State, in which the Courts have ruled a portion of an employee noncompetition agreement invalid, has been to "blue pencil" (cross out) the violative portions of the agreement and, if the excised portions of the agreement are severable, to permit the agreement to stand minus the unenforceable wording; otherwise the entire agreement is void. *See, e.g., Tawney v. Mutual Systems of Md.*, 186 Md. at 521, 47 A.2d 327 (portion of covenant preventing competition in Baltimore City for two years severed in its entirety as excessive in time and scope); *MacIntosh v. Brunswick*, 241 Md. 24, 27–31, 215 A.2d 222 (1965) (noncompetition clause voided in its entirety where area and duration were excessive). Faw, Casson claims that there is a separate line of Maryland case law which supports the circuit court's modification, in the case *sub judice*, of the express terms of the agreement; they cite *American Weekly, Inc. v. Patterson*, 179 Md. 109, 16 A.2d 912 (1940), and *Hebb v. Stump, Harvey & Cook*, 25 Md.App. 478, 334 A.2d 563 (1975). We do not agree that these cases support Faw, Casson's proposition.

In *American Weekly*, as part of a purchase and sale agreement of a newspaper, the parties entered a multi-part noncompetition agreement which included a provision that the buyer, Patterson, would not sell certain papers in the seller's remaining sales territories. The seller later sold its interest in those other territories to a third party. Patterson then disregarded the terms of the previous agreement with the seller and went into competition with the third party buyer. The seller sued Patterson under the noncompetition clause and the Court, applying a traditional "blue pencil" approach, struck out the entire restrictive clause

because "the interest which the covenant was designed to protect is [not] still outstanding in the covenantee so as to warrant the full and literal application of the language used." *American Weekly*, 179 Md. at 115, 116, 16 A.2d 912. The Court did not attempt to add words to the express contract as was done in the case *sub judice*. Rather, the Court's actions in *American Weekly* are indistinguishable from the Court's strict blue pencil approach taken in *MacIntosh*. Perhaps Holloway's assertions to the contrary were made in reliance on certain dicta in *American Weekly* in which the Court, citing Williston on Contracts, 14th Ed. Section 1660, noted that "where the covenant as originally drawn has been found too broad, courts have had no difficulty in restricting it to its proper sphere and enforcing it only to that extent." *American Weekly*, 179 Md. at 115, 16 A.2d 912. This dicta was later cited as Maryland law by the Supreme Court of Delaware in *John Roane, Inc. v. Tweed*, 33 Del.Ch. 4, 89 A.2d 548 (1952) because, as the court noted, "in the absence of any other Maryland authority we must accept the quoted statement as Maryland law, even if regarded as dictum." *Id.* 89 A.2d at 556.

*Hebb* is equally undispositive of the present issue. In that case a restrictive covenant prohibited the employee from dealing with "our customers" after he left the plaintiff's employment, and it provided durational and geographic restrictions on competition. The Court completely struck out the severable durational and geographic limitations in the contract and construed the vague phrase "our customers" narrowly so as to exclude those customers whom the former employee had solicited prior to his employment by the plaintiff. This process involved a combination of the application of the traditional "blue pencil" approach and the Court's interpretation of vague language in a contract. There was no need for the court to actually alter the *express* language of the agreement as was done in the case *sub judice*. Unlike the phrase "our customers", "five years" is capable of only one interpretation. In *Hebb*, as in

*American Weekly,* the Court, in *dicta,* quoted Professor Williston's position, *supra.*

The *dicta* in both *Hebb* and *American Weekly,* notwithstanding, Maryland law has never explicitly embraced the position urged by Faw, Casson. Nevertheless, it is equally clear that the Maryland courts have not rejected either party's position and the issue raised is plainly one of first impression in this State.

Despite the absence of controlling Maryland law there are numerous respected and well reasoned authorities on the issue to support each party's position. The courts and commentators have, for the most part, allied themselves with one of the following two camps:

(a) *The "Blue Pencil" Rule (Strict Divisibility)*—

By this rule, the divisibility of a promise in excessive restraint of trade is determined by purely mechanical means: if the promise is so worded that the excessive restraint can be eliminated by crossing out a few of the words with a "blue pencil," while at the same time the remaining words constitute a complete and valid contract, the contract as thus "blue penciled" will be enforced.

6A A. Corbin, Contracts § 1390, at 68 (1962).

This approach is exemplified in comment b to the Restatement of Contracts § 518 (1932):

[A] promise not to engage in business within the limits of a State, except in a named city, is indivisible as to the whole territory included in the promise, and if that territory is unreasonable in extent the promise is wholly unenforceable, while a promise not to engage in a particular business in a named city, or at any other place, is divisible and enforceable as to the city.

Professor Corbin criticizes this approach as lacking a logical foundation:

By some occult process, the courts adopting this rule convinced themselves that partial enforcement without the aid of a "blue pencil" would be "making a new

contract for the parties" while partial enforcement in the wake of a "blue pencil" is not.

Corbin, *supra*, at 68. Despite such criticisms, numerous jurisdictions have presented meritorious justifications for requiring a strict application of the "blue pencil" test.

The Supreme Court of Arkansas justified a strict application of the "blue pencil" approach as necessary to enhance judicial economy:

> Such a practice of granting partial injunctive relief not only amounts, as we have seen, to a judicial rewriting of the parties' contract; it also has a clear tendency to provoke unnecessary litigation. That is, even though the restriction is unreasonably far-reaching the employer has nothing to lose by going into court and seeking partial injunctive relief.
>
> Williston, ... suggests that the latter difficulty can be avoided "in part at least" by completely invalidating covenants that are deliberately unreasonable and oppressive. That solution is apt to be ineffective, for the employer, forewarned, has only to make a restrictive contract ostensibly within the outer boundaries of reasonableness to avoid the penalty proposed by Williston.

*Rector–Phillips–Morse, Inc. v. Vroman,* 253 Ark. 750, 489 S.W.2d 1, 61 A.L.R.3d 391, 396 (1973) (citations omitted). Other commentators have seen the blue pencil rule as a shield to protect employees from the superior bargaining power which the employer possesses in the drafting of such agreements:

> [A]n employer should either write a restrictive covenant properly and reasonably or risk having the entire restrictive covenant held unenforceable, or at best, "blue penciled." This philosophy would better influence employers to write employment agreements as reasonably as possible, rather than asking courts to determine the fairness of the negotiating or bargaining process on some *ad hoc* basis.

Rosen & Loewy, *Restrictive Covenants in Maryland Employments: A Guide for Drafting,* 11 U.Balt.L.Rev. 377, 394 (1982). *See also Beit v. Beit,* 135 Conn. 195, 63 A.2d 161 (1948) (limitation on withdrawing partner held unreasonable and court would not reform the agreement); *Young v. Van Zandt,* 449 N.E.2d 300 (Ind.App.1983); *Rollins Protective Services Co. v. Palermo,* 249 Ga. 138, 287 S.E.2d 546 (1982); *Streiff v. American Family Mut. Ins. Co.,* 118 Wis.2d 602, 348 N.W.2d 505 (1984). This was also the position adopted by the *first* edition of the Restatement Contracts § 1390, Comment b (1932) (This position was reversed in the Second Restatement as discussed below.).

(b) *Strict Divisibility Not Required*—This approach has the support of both Professors Williston and Corbin:

[A] contract in restraint of trade will be enforced to the extent that it is reasonable and lawful, the test being whether partial enforcement is possible without injury to the public and without injustice to the parties.

The objection to this practice is that it tends to encourage employers and purchasers possessing superior bargaining power over that of their employees and vendors to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise may be upheld in part, if not in full.

This difficulty can be avoided in part at least by the adoption of the rule ... which completely invalidates covenants deliberately unreasonable and oppressive whether severable or not.

14 S. Williston, A Treatise on the Law of Contracts § 1647C, at 297 (3rd ed. 1972) (citations omitted).

If an attempt to impose an excessive restraint invalidates the whole promise, couched in indivisible terms, a similar attempt should invalidate a whole contract, even though couched in divisible terms. Legality of contracts should not depend on form, nor should differences in wording result in different legal conclusions where the agreements are of identical meaning. In the best considered modern cases, ... the court has decreed enforce-

ment as against a defendant whose breach has occurred within an area in which restriction would clearly be reasonable, even though the terms of the agreement imposed a larger and unreasonable restraint.

6A A. Corbin, Contracts § 1390, at 70–71 (1962). A flexible approach has also been adopted by numerous state courts. *See, e.g., Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d. 1310, 15 A.L.R. 4th 551 (1979) (stating that courts reform overly broad restrictive covenants if the employers first show that they acted in good faith); *Miller Mechanical, Inc. v. Ruth,* 300 So.2d 11 (Fla.1974) (3 year, 50 mile noncompetition clause in employment contract, reduced to reasonable restriction); *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975) (court held that it would enforce unreasonable noncompetition clause to extent necessary to protect employee's legitimate interests); *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127 (Minn.1980) (5 year period in employee noncompetition agreement reduced to 1 year); *Bob Pagan Ford, Inc. v. Smith,* 638 S.W.2d 176 (Tex.App. 1st Dist.1982) (3 year noncompetition clause in an employment contract reduced to 6 months); *Solari Industries, Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970) (For an in depth discussion on the issue). This is also the position taken in the Second Restatement of the Law of Contract in a complete reversal of positions since the publication of the first Restatement, *supra.* *See* Restatement (Second) of Contracts § 184 comment b illustration 2 (1979).

The Supreme Court of New Jersey, in overruling its prior adherence to the strict blue penciling approach, exposed major difficulties with its prior decisions:

> [T]he rule of divisibility or selective construction has, at the expense of the basic values, exalted formalisms and rewarded artful draftsmanships. In the process individual results have been reached which hardly conform with any sound equitable concepts. In some instances, judges have upheld sweeping noncompetitive agreements in circumstances which suggest that, if their equitable power

to do so had been recognized, they would have cut them down to satisfy the particular needs at hand. In other instances, they have stricken noncompetitive agreements in their entirety, as too broad, though justice and equity seemed to cry out for the issuance of appropriately limited restraints which would simply protect the legitimate interests of the covenantee in reasonable fashion, would not subject the covenantor to any undue hardship, and would not impair the public interest.

*Solari Industries, Inc. v. Malady,* 264 A.2d at 60 (citations omitted.)

Despite the several valid criticisms leveled at the flexible approach we are convinced that, on the whole, the numerous justifications underlying this method outweigh the consideration behind the formalistic strict blue pencil approach and we adopt the position taken by Professors Williston and Corbin, *supra,* as the law in this State.

Holloway asserts that the flexible Corbin/Williston approach violates the fundamental law of contracts that where the terms of a contract are clear and unambiguous the court may not rewrite the contract for the parties even to avoid a hardship, *see, e.g., Stueber v. Arrowhead Farm Estates,* 69 Md.App. 775, 780, 519 A.2d 816 (1987); but his argument overlooks the fact that Maryland, like other jurisdictions, has never considered noncompetition clauses according to strict traditional contract theories. For example, the very remedy that Holloway requests, relief from his contractual obligations, would not be available at all if this case were a typical contracts case, that is, one not involving a noncompetition clause in an employment agreement, because none of the usual doctrines which permit a party to avoid their contractual obligations apply to the contract *sub judice.* There is no evidence of an act depriving Holloway of his free will so as to warrant avoidance of the contract for *duress or undue influence, cf. Simko, Inc. v. Graymar Co.,* 55 Md.App. 561, 464 A.2d 1104 (1983) (upholding enforcement of a restrictive covenant where a salesman was ordered to sign or face discharge), *cert. denied,* 298 Md.

243, 469 A.2d 452 (1983); or is Holloway precluded from performing by *impossibility, see Acme Markets v. Dawson Enterprises,* 253 Md. 76, 89–90, 251 A.2d 839 (1969); or by a *frustration of purpose, id.* at 90, 251 A.2d 839.[10] The only potential relief for Holloway lies in the special consideration which the courts undertake in reviewing a challenge to the validity of a noncompetition clause, *see Becker v. Bailey,* 268 Md. 93, 96, 299 A.2d 835 (1973), considerations which are not applied in reviewing any other type of contractual agreement. Noncompetition clauses are given extraordinary consideration by the courts and they therefore warrant extraordinary remedies.

 The gist of the test applied in the cases and treatises, *supra,* which support the flexible approach is essentially a two part inquiry: (1) Does the restrictive covenant as a whole evidence a deliberate intent by the employer to place unreasonable and oppressive restraints on the employee/covenantee? If so, then the entire covenant is invalidated, whether severable or not. (2) If the agreement, although unreasonable, satisfies the test in part 1, then the court should modify the express terms so as to align the reasonable expectations of the parties to the reasonable expectations of the law, so long as it is fair to do so. Applying this test to the case *sub judice,* the agreement and the evidence do not show a *deliberate* intent by Faw, Casson to place unreasonable and oppressive restraints on Holloway. The record reflects that the parties entered into a contract in good faith in which Faw, Casson attempted to

---

**10.** Another way to approach appellant's concerns is to recognize that in applying the Corbin/Williston flexible approach, the courts do not "rewrite" contracts, rather, they engage in a more complete application of traditional blue penciling. It is a familiar principle of law that "subsisting laws enter into and become part of a contract as if expressly referred to or incorporated in its terms." *Beca v. City of Baltimore,* 279 Md. 177, 182, 367 A.2d 478 (1977) (citations omitted). Therefore, every contract which by its terms expressly restricts competition for an unreasonable duration or distance, also expressly limits competition to a lawfully reasonable period and the court can apply the traditional blue pencil to strike out the unreasonable constraints while leaving intact the reasonable constraints.

place reasonable restraints on the employee so as to protect legitimate partnership concerns. Faw, Casson did not intend by the agreement to enjoin Holloway from practicing his profession but merely to extract reasonable payment for what the partnership justifiably considered a partnership asset, the partnership good will. Faw, Casson's principal error in drafting the agreement was to underestimate the importance which this Court would place on the public's interest in employing the accountant of its choice. We do not find that this was a deliberate mistake or, due to the lack of case law on point in this State, that it was a predictable error. Furthermore, we do not find that any unfairness results from the modifications. We hold, therefore, that the circuit court did not err in its reduction of the number of years in the restrictive covenant from five down to a number of reasonable duration.

## IV.

### *Liquidated Damages*

Holloway next challenges the circuit court's determination, by way of the denial of his motion for summary judgment on the issue, that the "liquidated damages" clause in section XXI of the Partnership Agreement is a valid and completely enforceable liquidated damages clause. Holloway, citing *Massachusetts Indemnity and Life Insurance Co. v. Dresser*, 269 Md. 364, 306 A.2d 213 (1973), contends that this portion of the Agreement is an unenforceable penalty clause.

The relevant portions of section XXI, in essence, establish a four part remedy for Holloway's premature competition with Faw, Casson: (1) Holloway will pay to Faw, Casson 100% of the fees paid by a particular client to the partnership in the final year that that client was serviced by the partnership for any clients that were Faw, Casson's who engage Holloway's services in the restricted five year period; (2) Holloway forfeits all amounts due him under the partnership's "Continued Income Participation" ("CIP")

plan if he works as a public accountant within 40 miles of a Faw, Casson office during the five year period, or violates the provisions relating to the employer's customers; (3) if the amounts owed to Holloway under the CIP plan are insufficient to offset money due the partnership under (1) and (2) above, then the balance is subtracted from his capital account. Holloway disputes the circuit court's enforcement of each of these provisions.

In *Massachusetts Indemnity*, the Court reviewed the essential features of a valid, enforceable liquidated damages clause:

> First, such a clause must provide "in clear and unambiguous terms" for "*a certain sum,*" *Siler v. Marshall*, 251 Md. 342, 346, 247 A.2d 385, 387–88 (1968);.... Secondly, the liquidated damages must *reasonably be compensation for the damages anticipated* by the breach,.... *Hammaker v. Schleigh*, 157 Md. 652, 147 A. 790 (1929); *Mt. Airy Milling Co. v. Runkles*, 118 Md. 371, 84 A. 533 (1912), [and not impose a penalty for non performance, *see*, *Wilson v. M. & C.C. of Baltimore*, 83 Md. 203, 206 (1896); *Taylor v. Grafton*, 273 Md. 649, 662, 332 A.2d 651 (1975) ]. Thirdly, liquidated damage clauses are by their nature *mandatory binding agreements* before the fact which *may not be altered to correspond to actual damages determined after the fact, Siler v. Marshall, supra, John Cowan, Inc. v. Meyer*, 125 Md. 450, 94 A. 18 (1915), *Smithson v. U.S. Telegraph Co.*, 29 Md. 162 (1868); ...

*Id.,* 368–369, 306 A.2d 213 (Emphasis added.)

Applying these criteria to the agreement *sub judice,* we hold that:

■ (1) The circuit court was correct in holding that the *required payment of 100% of the prior year's fees* is an enforceable liquidated damages provision. Holloway is wrong in his contentions that this clause is not for a "certain sum" and amounts to a "penalty clause".

While the actual dollar figure of the liquidated damage provision was uncertain at the time the parties signed the Agreement, by using the specific formula provided in the agreement, the full amount was easily calculated at the time Holloway left Faw, Casson.[11] This case is neither like the situation in *Massachusetts Indemnity,* cited by Holloway, where the so called "liquidated damages" were not determinable until three years after a breach of the contract, nor is it like the agreement in *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 15 A.L.R. 4th 551, 555 (1979), which required payments based on the amount of earnings the client of the former employer brought to the former employee, and that amount would not be determinable until after the employee had serviced the client.

Holloway has not offered evidence to support his contention that 100% of the prior year's fees collected by Faw, Casson is an unreasonable estimation of the anticipated loss.[12] The unrebutted evidence presented by Faw, Casson is that this amount is generally the measure used when one firm buys another firm and that that amount is a reasonable estimation of the actual damages contemplated at the time of the parties agreement.

Faw, Casson's position on this issue is supported by decisions from other jurisdictions. In *Dobbins, Deguire & Tucker v. Rutherford, MacDonald & Olson,* 708 P.2d 577 (Mont.1985) the court upheld an agreement by which the

---

**11.** Holloway admitted that he had access to Faw, Casson's billing data even after he left the partnership.

**12.** We distinguish our reasoning here with that with regard to the CIP, pp. 242–243, *infra,* by explaining that, in addition to the lack of evidence, we envision the enforcement of this provision to be based upon the acquisition by Holloway of all or substantially all of the business of a client covered by the agreement. We recognize the possibility that there could be an inequity where, for example, a client may have provided $10,000 in annual fees to Faw, Casson and Holloway completes a minimal task for $100.00 for that client during the prohibited period. To allow damages of $10,000 would be unreasonable; however, we do not have that situation before us.

employee/partner agreed to pay to the employer/partnership 100% of the gross fees billed over a twelve month period by the employer for any client who was the employer's but was serviced by the former employee within one year after the employee left the partnership; the sum was to be paid in monthly installments over a three year period. By contrast, in *Cherry, Bekaert & Holland v. LaSalle,* 413 So.2d 436 (Fla.App.1972) the court found excessive and therefore unreasonable an accountant's agreement to pay 200% of the prior year's fees obtained from the former employer's clients if they were engaged by the employee within three years of leaving. And finally, in *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310 (1979), another case involving a public accountant's noncompetition agreement, the Court struck out as a penalty clause a requirement that a breaching employee pay each year for three years, fifty percent of the annual fees he received from servicing the plaintiff's former clients after the termination of his employment. Not only did this last agreement extract an excessive percentage, a total of 150% over the three year period, but in tying the percentage paid by the employee to the amount of business that a former client gave to the employee rather than to how much business he took from the employer the agreed amount of damages had no relation to the damages actually anticipated by a breach.

The required payment in the case *sub judice* of 100% of the fees generated by the client for the partnership in the client's last year with the partnership, which is payable over a three year period, is for a sum certain and falls well within the range of reasonable compensation for anticipated damages approved by these other jurisdictions. Accordingly, this portion of the Agreement satisfies the *Dresser* requirements for a valid, enforceable liquidated damages clause.

■ (2) The *forfeiture of the employees CIP benefits* for any breach of the agreement constitutes a penalty, *see Taylor v. Grafton,* 273 Md. 649, 662, 332 A.2d 651 (1975),

and the circuit court erred in sustaining this portion of the agreement. The employee's CIP payments have no reasonable relation to the anticipated damages caused by Holloway's breach and, therefore, their forfeiture can not "reasonably be compensation for the damages anticipated by the breach.". *Mass. Indem. & Life Ins. v. Dresser*, 269 Md. at 368, 306 A.2d 213. For example, if Holloway engaged a former Faw, Casson customer who used the partnership's services one time at a total fee of $100, Holloway would, under this provision, forfeit thousands of dollars in CIP benefits regardless of the negligible loss to the partnership. The only purpose for such a payment can be to penalize the employee, which makes this provision unenforceable.

▇ (3) Finally, the court was correct in permitting Faw, Casson to *subtract the amounts owed by Holloway from Holloway's capital account;* this is nothing more than a reasonable offset provision.

## V.

### *Breach of the Contract*

Holloway alleged, by way of both an affirmative defense to the complaint and as a counter-complaint, that Faw, Casson had materially breached the employment agreement. The trial court found that Holloway had failed to establish either the affirmative defense or the counterclaim and, at the close of all of the evidence, the judge granted Faw, Casson's motion for judgments on both. Holloway now challenges this ruling.

The relevant evidence on this issue is not disputed. Paragraph XI of the Partnership Agreement provides in part that:

1. Partners shall be paid annual salaries which shall be *established* by the Executive Committee *at the start of each fiscal year.* Such salaries may be *adjusted* upward or downward by the Executive Committee *throughout the year.* This is base salary.

2. Salaries paid pursuant to the provision of paragraph 1 hereof shall be treated as *expenses* of the partnership in determining profits and losses.

(emphasis added).

The Executive Committee originally established a salary for all of the partners in June 1983 for the fiscal year June, 1983—May 31, 1984. That amount was then adjusted in "the Fall" of 1983. The adjustment reduced not only the unearned salary from the date on which the change was made in the Fall of 1983, through May 31, 1984, but it also operated retroactively to recoup part of the higher salary earned by Holloway between June, 1983 and the Fall of 1983. Holloway argues that the entire Fall 1983 salary modification violates the terms of the partnership agreement because it was retrospective and indeterminate and not "established ... at the *start* of the fiscal year" and would further result in adjustment to his salary *after* the end of the fiscal year rather than during the fiscal year.

We agree with the circuit court's ruling that that portion of the salary adjustment which effects a prospective salary reduction from the Fall of 1983 thru May 31, 1984 is clearly authorized by the powers granted the Committee in item XI. Nevertheless, we do not agree that the partnership agreement gives the committee or the partners the authority to reduce that portion of the salary which had already been earned. Under the express terms of the agreement it was improper to reclaim that portion of his salary which Holloway earned from June, 1983 until the date on which the salary change became effective. To interpret paragraph XI so as to permit such a retroactive reduction would mean, for example, that if Holloway worked for 364 days since the start of the fiscal year at a salary of $100,000 then on day 365 of the same fiscal year the committee could reduce that amount to $40,000 effective as of the first day of the fiscal year. This is not a reasonable interpretation of the "intention of the parties" in adopting the agreement, *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328, 301 A.2d 12 (1973) ("The cardinal rule in construction and interpretation

of contracts is that effect must be given to the intention of the parties...."); *see also Orkin v. Jacobson,* 274 Md. 124, 129, 332 A.2d 901 (1975); *Hardy v. Brookhart,* 259 Md. 317, 270 A.2d 119 (1970); *Cadem v. Nanna,* 243 Md. 536, 543, 221 A.2d 703 (1966). However, the fact that Faw, Casson did breach the parties' employment agreement is of little substantive importance as it does not affect the correctness of the circuit court's ruling on either the counter-complaint or the affirmative defense to the complaint. We explain.

The *counter-complaint*—As the complaining party, the burden was on Holloway to prove not only that the agreement was breached, *Flaherty v. Weinberg,* 303 Md. 116, 134, 492 A.2d 618 (1985), but also to show, to a reasonable degree of certainty, the amount of damages which resulted from the breach, *Charles County Broadcasting Co., Inc. v. Meares,* 270 Md. 321, 332, 311 A.2d 27 (1973). Holloway's brief, however, does not refer to any evidence, including evidence of the amount of profits for the fiscal year involved, which would indicate how much, if any, measurable damages he suffered, or would have suffered, as a result of Faw, Casson's breach, Md. Rule 8–504(a)(4). Consequently, we affirm the circuit court's conclusion that Holloway "failed in his burden of establishing his counter-claim."

The *affirmative defense*—The fact that Faw, Casson breached the agreement does not necessarily provide Holloway with an affirmative defense to the Faw, Casson complaint. In a similar case, *Simko, Inc. v. Graymar Company,* 55 Md.App. 561, 464 A.2d 1104 (1983), the employee, Smith, had been denied his sales bonuses and commissions by the employer, which were guaranteed by the employment contract. These actions by the employer prompted Smith to leave Graymar and set up a competing company in direct violation of a covenant of noncompetition. Smith pled the employer's previous breach of the employment contract as an affirmative defense to the employer's suit on the noncompetition clause. The Court rejected this

as an affirmative defense and stated that "the alleged breach was not so material as to justify the court in concluding that the noncompetition covenants were unenforceable." *Id.* at 570, 464 A.2d 1104. On this issue, we find the case *sub judice* to be indistinguishable from *Simko.*

## VI.

### *Excluded Testimony*

The trial court rejected Holloway's attempts to establish through a witness that a prior course of dealing existed between the parties. Holloway contends that the trial court erroneously excluded this testimony which, he contends, would have aided the jury in interpreting part XXI of the agreement.

The Court of Appeals discussed the use of parol evidence in the interpretation and construction of contracts in *General Motors Acceptance v. Daniels*, 303 Md. 254, 492 A.2d 1306 (1985).

It is well settled that Maryland follows the objective law of contracts. *See Aetna Casualty & Surety Co. v. Insurance Commissioner*, 293 Md. 409, 420, 445 A.2d 14, 19 (1982). A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean. *Board of Trustees v. Sherman*, 280 Md. 373, 380, 373 A.2d 626,

629 (1977). As a result, *when the contractual language is clear and unambiguous,* and in the absence of fraud, duress, or mistake, *parol evidence is not admissible to show the intention of the parties* or to vary, alter, or contradict the terms of that contract....

Id., at 261, 262, 492 A.2d 1306 (emphasis added). We find the language in part XXI of the partnership agreement to be "clear and unambiguous" and therefore, the circuit court did not err in excluding parol evidence on the issue.

## VII.

### *Conversion*

Holloway next claims that the trial court erred in granting judgment in favor of Faw, Casson on count four of the counter-complaint in which he alleged conversion by the remaining partners of his share of the partnership assets, specifically, his share of the capital account and the partnership property. We agree.

The standard of appellate review to be employed where a motion for a directed verdict has been ruled upon by the lower court involves a resolution of the question as to whether there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue which, if present, would warrant a finding that the trial court invaded the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied.

*Ralph Pritts & Sons v. Butler,* 43 Md.App. 192, 199–200, 403 A.2d 830 (1979). In a cause of action for conversion, this standard requires that to avoid the defendant's motion for judgment the plaintiff must present evidence sufficient to establish a *prima facia* showing that there was an "improper withholding of the property from the rightful owner", *Kalb v. Vega,* 56 Md.App. 653, 666, 468 A.2d 676 (1983) and, this definition includes situations where an employer withholds post-employment payments due under an

employee benefit plan based upon the employee's alleged breach of an anti-competition clause. *See Food Fair Stores v. Greeley,* 264 Md. 105, 285 A.2d 632 (1972); *Food Fair Stores v. Hevey,* 275 Md. 50, 338 A.2d 43 (1975); *Kalb v. Vega,* 56 Md.App. 653, 666, 468 A.2d 676 (1983) (conversion is accomplished by "the improper withholding of the property from the rightful owner).

In the case *sub judice,* the undisputed evidence presented during the trial reflects that pursuant to the partnership agreement, Holloway was entitled to the balance of his capital account of $37,417.00 upon his departure from Faw, Casson. The firm, in turn, was entitled to offset Holloway's capital account and his CIP payments by any amount which Holloway owed under paragraph XXI of the Agreement. The disputed evidence, and the primary issue upon which the case was sent to the jury, concerned the determination of the amount which Holloway owed Faw, Casson under paragraph XXI. Since that amount had not been determined at the time that the court granted Faw, Casson's motion for judgment, it is possible that the jury could have concluded that the amounts withheld by Faw, Casson pursuant to paragraph XXI of the agreement were exceeded by the $37,417.00 in Holloway's capital account. In that case Holloway would have been entitled to a verdict in his favor under the rule in *Greely, Hevey,* and *Vega, supra,* on the claim for conversion. Therefore, the trial judge erred in granting Faw, Casson's motion for judgment on the counter-claim.[13]

As a final note on the issue of his counter-complaint, Holloway asserts that the partnership agreement is silent on his rights as a withdrawing partner and, therefore,

---

13. The actual amount of offset due Faw, Casson against Holloway's capital account and CIP will depend on the outcome of this case on remand. If on remand it develops that in fact an undisputed portion of Holloway's debt to the firm on the complaint exceeds the amount in his capital account then the trial court on remand would be justified in granting a motion by Faw, Casson for judgment on this issue.

section 9–613 of the Corporations and Associations Article controls this matter. Section 9–613 states in part:

> When any partner retires or dies, and the business is continued under any of the conditions set forth in § 9–612(a), (b), (c), (e), and (f) or § 9–609(b)(2), without any settlement of accounts as between him or his estate and the person or partnership continuing the business, *unless otherwise agreed,* he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained. (Emphasis added).

Appellant is incorrect; the agreement specifically provides in paragraph XXI that, upon voluntary withdrawal, a partner:

> shall surrender his interest in the partnership and be entitled to withdraw the capital account standing in his name on the records of the partnership calculated on the accrual basis at the close of the fiscal year immediately preceding the date of his withdrawal, less any amount (except for salary allowances) withdrawn subsequent to the close of the fiscal year.

These express terms of the agreement control and, therefore, § 9–613 is inapplicable.

## VIII.

*Pre–Judgment Interest Award*

 Finally, Holloway contends that there was *no* evidence presented at the trial to justify *any* jury award of pre-judgment interest and the trial judge erred in denying his motion for a new trial on that issue. We decline to address this issue because Holloway failed at the trial level to preserve the issue properly for appellate review. Rule 8–131(a).

The trial judge instructed the jury that it had within its discretion the power to award pre-judgment interest. Holloway did not object to this instruction which he now, in essence, claims was an improper instruction, one not sup-

ported by any evidence in the case. *Moats v. Ashburn,* 60 Md.App. 487, 493, 483 A.2d 791 (1984). Under Md. Rule 2–520(e) objections to jury instructions must be placed on the record "promptly" after the court instructs the jury and a tardy objection is insufficient to preserve the error for appeal. *See Landis Office Center v. Barefield,* 73 Md.App. 315, 533 A.2d 1332 (1987). No such objection appearing in the trial record, we decline to address the issue.

It should be noted that Holloway's objection here, although couched in terms of a motion for new trial based on the insufficiency of the evidence, is not like the case of *Thodos v. Bland,* 75 Md.App. 700, 542 A.2d 1307 (1988) which we addressed last term. In *Thodos,* the appellant claimed that the verdict was against the *weight* of the evidence. By contrast, Holloway's attack is not as to the weight of the evidence, but rather he asserts that there was never *any* evidence presented on the issue, in which case an instruction on prejudgment interest should never have been given to the jury.

In summary, we hold:

I. That the circuit court did not err in finding five years to be an unreasonable period of restriction.

II. That the circuit court did not err when it modified the covenant to three years and partially enforced the Agreement to that extent.

III. That as rewritten the Agreement is reasonable as to area and duration and imposes no excessive hardship on Holloway and is not injurious to the public interest.

IV. That as modified the Agreement contains an enforceable liquidated damage clause rather than an unenforceable penalty and forfeiture clause.

V. The circuit court erred in its conclusion that Faw, Casson did not breach the employment contract; however, the court was ultimately correct in ruling that as a matter of law Holloway failed to establish that Faw, Casson's breach of the employment contract was an affirmative

defense to the complaint, and that Holloway failed to establish his counter-complaint for breach of contract.

VI. That the circuit court was correct in excluding testimony offered by Holloway relating to the "clear and unambiguous" language in part XXI of the Agreement.

VII. That the circuit court erred in granting Faw, Casson's motion for judgment on Holloway's counter-claim that Faw, Casson had converted Holloway's partnership interest.

VIII. That the issue of whether there was sufficient evidence to justify an award of prejudgment interest was not preserved for our review.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED FOR PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID SEVENTY–FIVE PERCENT BY APPELLANT AND TWENTY–FIVE PERCENT BY APPELLEE.

GILBERT, C.J., dissents.

GILBERT, Chief Judge, dissenting.

I dissent from the majority's sesquipedalian opinion, in which they purport to rewrite part of the Maryland Law of Contracts.

If, as has been said, judicial activism is to the law what garlic is to cooking—it improves the product—then too much garlic has been added in the instant case, and instead of pot roast we are being served hash.

Aside from the fact that I have great difficulty in determining why a five year restriction against competition is violative of public policy but three years is not, I am unable to accept the proposition that courts should rewrite agreements in order to save the parties from themselves.

Paraphrasing Neil Armstrong, the majority makes one small step to validate the invalid and one giant step that changes substantially the law of contracts. With their

opinion the majority takes the Court on its first stride on a road that will lead Lord knows where.

Patently, the judicially rewritten agreement in the case *sub judice* is not what the parties intended. The majority not only sanctions a trial court's writing of a contract but then permits the court to award damages on the strength of what it rewrote. Imagine the unrest and uncertainty in a business world where courts may rewrite a contract because they believe the contract is unfair to one side or the other, rewrite leases because they are worded in a manner which appears tilted in favor of the landlord as opposed to the tenant, rewrite bonds because the judge thinks they do not pay enough interest or that they pay too much, or change the consideration because it is too little or too one-sided.

I recognize that some courts, in finding unreasonable the express time restrictions on competition in employment contracts, have modified those temporal restrictions so as to achieve reasonableness. *See John Roane, Inc. v. Tweed,* 33 Del.Ch. 4, 89 A.2d 548 (1952); *Miller Mechanical, Inc. v. Ruth,* 300 So.2d 11 (Fla.1974); *Slade Gorton & Co. v. O'Neil,* 355 Mass. 4, 242 N.E.2d 551 (1968); *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127 (Minn.1980); *Schmidl v. Central Laundry & Supply Co.,* 13 N.Y.S.2d 817 (N.Y.1939); *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975); *Bob Pagan Ford, Inc. v. Smith,* 638 S.W.2d 176 (Tex.App. 1st Dist.1982). Other courts have directed their attention to the "blue pencil rule" itself and rejected it. *American Eutectic Welding Alloys Sales Co. v. Rodriguez,* 480 F.2d 223 (1st Cir.1973); *Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 (Iowa 1971); *Solari Industries, Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970).

In light of the revision of the Restatement Second of Contracts and those pronouncements made by the courts of some of our sister states, modification might be considered the "modern trend." *Raimonde,* 325 N.E.2d at 546. That does not mean, however, that Maryland will follow the

"modern trend" parade. History demonstrates that, before they join a parade as marchers, Maryland courts want to know where the parade is going. The "modern trend" in tort law, for example, appears to favor comparative negligence, yet the Court of Appeals has recently rejected that concept. *Harrison v. Montgomery County Board of Education*, 295 Md. 442, 456 A.2d 894 (1983). The "modern trend" allows a child to sue his or her parent in negligence, but Maryland does not. *Frye v. Frye*, 305 Md. 542, 505 A.2d 826 (1986). The majority of the panel, it appears, prefers to ignore Maryland's legal history and rushes to join the parade.

Implicitly, the majority suggests that the Court of Appeals in *MacIntosh v. Brunswick Corp.*, 241 Md. 24, 215 A.2d 222 (1965); *Tawney v. Mutual System of Md., Inc.*, 186 Md. 508, 47 A.2d 372 (1946); and *American Weekly, Inc. v. Patterson*, 179 Md. 109, 16 A.2d 912 (1940), either ignored or overlooked its powers to rewrite restrictive employment agreements so as to have them conform with public policy. The Court of Appeals, in my view, was fully cognizant of its authority to change the invalid time and space restrictions, but its belief in the sanctity of contract was obviously much stronger than that of the majority of this panel.

That the majority struggles to justify its actions is made crystalline by the length of the epistle in which it espouses an inherent power in the courts to rewrite restrictive employment contracts upon the terms and conditions the court deems fair and equitable.

I think it is for the Court of Appeals, not this Court, to set the judicial policy of this State. We should continue to follow *MacIntosh* and its siblings unless and until the Court of Appeals holds otherwise.

Needless to say, I would reverse the judgment of the circuit court.