468 A.2d 676

Gerald KALB

v.

Richard VEGA.

No. 255, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Dec. 14, 1983.

Leonard A. Orman, Baltimore, for appellant.

Durke G. Thompson, Bethesda, with whom were Marcia C. Fidis, N. Alfred Pasternak and Goldberg, Thompson, Pasternak & Sickles, P.A., Bethesda, on brief, for appellee.

Argued before GILBERT, C.J., WILNER, J., and JAMES C. MORTON, Jr. (Ret'd.) Specially Assigned Judge.

WILNER, Judge.

On or about June 15, 1978, Gerald Kalb sold to Richard Vega 98 shares of common stock in a corporation known as Telecommunications Systems, Inc. (TSI). The purchase price was $6,000. Kalb later came to believe that he had been defrauded by Vega—that the stock was worth a great deal more than $6,000, and that by a combination of concealment and affirmative misrepresentation Vega had induced Kalb to sell the stock for the lower price. On November 15, 1979, Kalb sued Vega in the Circuit Court for Baltimore City seeking a rescission of the sale and the return of the stock. The case was later transferred to Anne Arundel County.

In June, 1980, before the case came to trial, Vega sold the 98 shares, along with 98 other shares that he had owned previously, to a third party, Fischer Medical Publications, Inc. (Fischer). Fischer, shortly thereafter, sold all of its stock, including Kalb's 98 shares, to a fourth party. As both Fischer and its transferee were regarded as bona fide purchasers, thereby making rescission of the Kalb-Vega agreement impossible, Kalb's action against Vega became one for conversion, in which the principal relief sought was damages.

On November 3, 1982, after a full trial and the receipt of post-trial memoranda, the court filed a written opinion and order, in which it found that (1) Vega had indeed misrepresented the value of the stock in connection with the June, 1978 sale, but (2) Kalb had failed to prove the actual value of the stock *at that time*. Believing that the appropriate measure of damages was the value of the stock at the time it was sold to Vega, the court entered judgment in favor of Kalb for nominal damages of $1.00.

Both Kalb and Vega are displeased with the judgment. Kalb thinks that he is entitled to the difference between the $6,000 he received from Vega in 1978 and the $59,000 that he calculates Vega received from Fischer for the 98 shares in 1980. Vega has no problem with the court's finding as to damages, but assails the finding that he was guilty of

misrepresentation. Thus, we have cross-appeals. Vega will lose both of them.

## Vega's Appeal: Liability

■ The court's findings with respect to Vega's alleged misrepresentation are mixed ones of law and fact. The real dispute is over what Vega told Kalb about the condition and prospects of TSI in order to induce him to sell the stock for $6,000, and how Vega's representations squared with the actual condition and prospects of the company. The evidence regarding those questions is, to some extent, in conflict, and we are thus governed by the strictures of Md.Rule 1086. We do not weigh the evidence; we look only to see if there was any substantial evidence in the record to support the court's factual conclusions. If there is any such evidence, we are not at liberty to disturb those conclusions.

TSI was founded in 1974 by Vega, Kalb, and Fischer. As its name implies, it was in the telecommunications business. Specifically, it was formed to provide microwave "pay television" programming and other kindred services in cities having no existing cable TV system. Under FCC licenses, TSI would build and operate transmitter facilities and sell air time over those facilities to other entities who would then market the programs to individual homes.

Kalb and Vega had some experience in the telecommunications industry; they were to "run" the business, Vega acting as President and Kalb as Vice-President. Fischer's role was essentially that of financier; it put up most of the capital. Of the 400 shares of stock initially issued, Fischer received 204 (51%), and Kalb and Vega each received 98 or 24½%.[1] Kalb and Vega each signed identical employment agreements calling for each to devote his "full time and

---

1. The basic corporate documents describing precisely how many shares were issued to each person are not in the record. There appear to have been two classes of common stock, of which 196 shares of Class A and 204 shares of Class B stock were issued. It would seem that Kalb and Vega got the Class A stock, and Fischer got the Class B stock.

efforts" to the company and to "perform his duties faithfully, diligently and to the best of his ability." Paragraph 6 of the agreement provided a caveat to the "full time" requirement. It stated:

"The Company acknowledges that the Employee is a recognized Telecommunications expert and may from time to time be engaged by other entities to provide consulting services. The Company agrees to permit the Employee to engage in, and be compensated for by others, occasional consulting opportunities on a non-interference basis with the Company's day-to-day business activities. Further, the Employee agrees that (a) he shall not become engaged with companies and/or individuals in direct competition with the Company, (b) he shall not become engaged by anyone to support claims against the Company, and (c) he shall neither furnish nor divulge to anyone any knowledge or information relating to the confidential processes of the Company."

TSI commenced its business shortly after its formation by purchasing from another company an existing FCC license authorizing transmission in Baltimore and two FCC construction permits authorizing the construction of transmission facilities in Richmond, Virginia, and Allentown, Pennsylvania. Upon completion of the transmission facilities, these permits would become licenses to operate. With the licenses and permits, TSI also acquired certain equipment necessary to construction and operation of the transmission facilities in those cities.

The transmission facility for Baltimore was in place in 1974, and all TSI had to do there was to sell the air time. To do that, it created a wholly-owned subsidiary known as Premium Cinema Club, sold the air time to it, and had it (Premium) offer the programming to the ultimate consumers. The Baltimore market thus became operational, and revenue-producing, in early 1975. TSI was not as fortunate in Richmond or Allentown; the transmission facilities there were not completed until some time in 1977.

In 1976, the FCC issued a new ruling or interpretation that forbade licensees from selling both the air time and the programming—*i.e.,* doing what TSI was doing in Baltimore through its subsidiary. TSI therefore sold the assets of Premium Cinema Club to another company. Kalb then left TSI and began working for the company that bought Premium's assets. In February, 1977, he left that job and took up work in another industry. He retained his 98 shares of TSI stock, but apparently had no other connection with the company. Vega stayed on as president and chief executive officer of TSI.

Although Kalb severed his connection with TSI (other than his stock), he did, from time to time, converse with Vega. In late 1977 or early 1978, Vega "expressed an unhappiness with the contributions that he had been required to make personally to keep T.S.I. afloat." In February, 1978, Kalb attended a stockholders meeting at which "there was a thorough discussion of the situation."

In May, 1978, Vega indicated a desire to purchase Kalb's stock. At the time, the company was in poor financial condition. The only station operating was Baltimore, which was not producing enough revenue to pay expenses. TSI owed Fischer about $450,000, and Fischer was refusing to put any more money into it. Kalb was aware of the situation and believed that TSI's prospects were dependent upon making the Richmond and Allentown stations profitable. According to Kalb, Vega confirmed that TSI was in "dreadful condition," and asserted that "there were no prospects for the Allentown and Richmond stations," notwithstanding that both had transmitters in place. Vega represented the assets of TSI to be the FCC licenses for Baltimore, Richmond, and Allentown and FCC construction permits for Wilmington, Delaware, and Trenton, New Jersey.

Vega told Kalb that there was not enough money in TSI to pay his salary, and that "it was going to require his putting in his own money into the company and he didn't care to do that unless he owned more of the stock."

Upon these representations, said Kalb, he agreed to sell his 98 shares to Vega for $6,000. The final agreement was signed and settled on June 15, 1978.

While Kalb and Vega were negotiating the stock sale, Vega, as president of TSI, was engaged in negotiations with a company known as Satellite Television and Associated Resources (STAR) for the sale of air time in Richmond and Allentown. Kalb claimed that he knew nothing about these negotiations with STAR. Just after the stock sale was consummated, TSI signed contracts with STAR for those cities.

At about the same time, Kalb discovered through a trade journal that Vega had filed for additional FCC permits in names other than TSI. In August, 1978, Fischer also discovered these filings and insisted that Vega transfer the permits to TSI. It regarded them as TSI assets. Vega, according to Donald Sommers, Fischer's liaison with TSI, refused to make the transfer, whereupon Fischer threatened suit. Eventually, in return for Fischer's agreement to modify Vega's employment contract and to increase his salary, Vega transferred a number of these licenses or permits to TSI.

Both Kalb and Sommers testified that the sale of air time in Richmond and Allentown enhanced the value of the company. Sommers stated as well that the transfer of Vega's individual filings to TSI increased the potential of the company and made it a better company. Kalb stated explicitly that he would not have sold his stock to Vega for $6,000 had he known of the imminent signing of the Richmond and Allentown contracts or the licenses and permits acquired by Vega.

Vega continued to run TSI until 1980, when, after a disagreement with Fischer, he sold all of his stock to Fischer and severed his connection with the company. Between 1978 and 1980, TSI's condition had improved markedly. According to Mr. Sommers, when Vega left, TSI held permits or licenses, either alone or in partnership with others, in

about twenty cities. Vega received net consideration of $119,000 for his 196 shares.

Vega denied doing anything wrong. He said that he had mentioned the STAR group to Kalb in 1977, that Kalb "had full knowledge of what the assets of TSI were," and that he (Vega), as a consultant, had prepared many FCC permit applications for other people and had put the money he received for his services into TSI.

Vega argues to us that this aspect of the case is controlled by *Llewellyn v. Queen City Dairy,* 187 Md. 49, 48 A.2d 322 (1946), and he is not entirely wrong in that argument. When read in proper context, however, *Llewellyn* does not provide much help to him.

*Llewellyn* came to the Court of Appeals from an order overruling a demurrer; the issue was the legal sufficiency of plaintiffs' amended bill of complaint for declaratory relief. The bill, brought by a corporation and two of its stockholders, alleged that two directors of the corporation had entered into "an illegal agreement to secure control of a majority of the stock of the corporation for their benefit," that the agreement constituted a conspiracy against the corporation, that in furtherance of the agreement the defendant directors took options from a number of the shareholders, and that "in securing these options the defendants made either misstatements or misrepresentations regarding the financial condition of the corporation. . . ." The action was based on the theory that the directors had fiduciary responsibilities to both the corporation and its stockholders.

The Court of Appeals first concluded that the assertions regarding an "illegal agreement" and "misstatements or misrepresentations" were "mere characterizations of the needed facts rather than allegations of them, and cannot be considered." 187 Md. at 57, 48 A.2d 322. It then declared that a corporation had no authority or standing to maintain a suit such as that on behalf of its stockholders. Finally, with respect to the plaintiff stockholders, the Court rejected the notion that directors had a fiduciary relationship with

individual stockholders, and found nothing wrong with a director purchasing stock from a shareholder. The crux of the decision in that regard appears in this passage from p. 58, 48 A.2d 322:

"There is nothing illegal in a director buying stock from a stockholder. *Of course, he cannot resort to misrepresentation and fraud in purchasing stock, just as a stranger to the corporation cannot resort to such methods."* (Emphasis supplied.)

Quoting then from an A.L.R. Annotation, the Court went on to state, at pp. 58–59, 48 A.2d 322, that, because there is no fiduciary relationship between the director and the stockholder, "the mere failure on the part of such officer or director, in purchasing the shares from the stockholder, to disclose any inside information, will not militate against him *so long as he does not actively mislead the seller or perpetrate a fraud....*" (Emphasis supplied.) The Court made quite clear that, if a shareholder "is cheated through misrepresentation and fraud," he *does* have an action against the buyer.

The elements of actionable fraud have been set forth many times by the Court of Appeals. To recover damages in an action of deceit, or, alternatively, to rescind a contract, the plaintiff must show (1) that a representation made by the defendant was false; (2) that either its falsity was known to the defendant or the misrepresentation was made with such reckless indifference to truth as to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff not only relied upon the misrepresentation but had the right to rely upon it with full belief in its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that the plaintiff suffered damage directly resulting from the misrepresentation. *See Appel v. Hupfield,* 198 Md. 374, 378, 84 A.2d 94 (1951); *Gittings v. Van Dorn,* 136 Md. 10, 109 A. 553 (1920); *Martens Chevrolet v. Seney,* 292 Md. 328, 333, 439 A.2d 534 (1982).

Though, as we have said, the evidence is in some dispute as to what Kalb knew at the time of the sale, if his testimony is credited to the exclusion of Vega's, as the court had a right to do, there was more here than a "mere failure . . . to disclose . . . inside information." The court could properly find that (1) by representing to Kalb that there were no prospects for Richmond and Allentown when, in fact, contracts were then under negotiation and were about to be executed, and by failing to disclose the licenses and permits acquired by him that rightfully belonged to TSI, Vega had misrepresented the value of TSI, both affirmatively and by concealment; (2) the misrepresentations were made knowingly; (3) they were made in order to defraud Kalb by inducing him to sell his stock for less than its real value; (4) Kalb relied on Vega's representations, that, in light of their past friendly association, he had a right to rely on them, and that but for those representations he would not have sold the stock for $6,000; and (5) in light of what occurred thereafter, Kalb suffered damage from the misrepresentations.

### Kalb's Appeal: Damages

The record before us contains no evidence of the value of Kalb's 98 shares at the time he sold them to Vega, other than the $6,000 purchase price. Indeed, the only evidence of value offered by Kalb was the amount received by Vega when he sold his 196 shares to Fischer two years later, in July, 1980. That is what Kalb claims he is entitled to—the difference between the $6,000 he got from Vega and half of the $119,000 Vega received from Fischer.

The law gives to a defrauded party an election between two inconsistent and therefore mutually exclusive remedies. He may, "by appropriate action, promptly rescind the contract and be restored to [his] former position" or he may "affirm [the contract] by performing the contract and claim damages due to the concealment or misrepresentation." *Nelley v. Baltimore City,* 224 Md. 1, 7, 166 A.2d 234 (1960); 12 *Williston On Contracts,* § 1528.

■ Had Kalb initially elected to affirm the contract and sue for damages, he would have been required to prove the value of the stock as of June 15, 1978. Generally, the measure of damages for fraudulently inducing a vendor to sell his property is the difference between the value of the property at the time of the sale and the amount actually received for it by the vendor. *See Dittbrenner v. Myerson,* 114 Colo. 448, 167 P.2d 15, 22 (1946); *Keeler v. Fred T. Ley & Co.,* 65 F.2d 499 (1st Cir.1933); 37 C.J.S. *Fraud,* § 143a; *cf. Murphy Oil Co. v. Burnet,* 55 F.2d 17, 25 (9th Cir.) *aff'd* 287 U.S. 299, 53 S.Ct. 161, 77 L.Ed. 318 (1932). If the defrauded seller fails to prove the value of the property at the time of sale, he may be precluded from recovering anything (or at least anything more than nominal damages). *Sheppard v. Sweatt,* 213 S.W.2d 718 (Tex.Civ.App.1948); and *cf. Dassing v. Fred Frederick Motors, Inc.,* 240 Md. 621, 214 A.2d 925 (1965), and *Schwartzbeck v. Loving Chevrolet,* 27 Md.App. 139, 339 A.2d 700 (1975), applying the same measure of damage and the same requirement of proof to a defrauded buyer.[2]

■ The fact is, however, that Kalb did *not* elect to affirm the contract. He very clearly opted for rescission. Immediately upon discovering Vega's concealments and misrepresentation, he called Vega and demanded the return of his stock. That demand was repeated in a more formal manner in a letter dated August 11, 1978, from Kalb's counsel. The bill of complaint, filed in equity, sought rescission of the sale and the return of the stock.

---

2. In the case of a defrauded *buyer,* some additional considerations may be involved, and thus a more flexible approach has been taken. The court may apply the classic "out of pocket" formula—i.e., "the value of the object as represented less its actual value at the time of sale," which is the exact converse of the normal rule applicable to defrauded sellers, or the "benefit of his bargain" rule, which is intended to compensate the buyer "as though the transaction had been carried out as represented." *Hinkle v. Rockville Motor Co.,* 262 Md. 502, 504–05, 278 A.2d 42 (1971).

In light of the court's findings as to liability, which we herewith affirm, had the case proceeded in accordance with Kalb's election, Kalb would have been entitled to the return of his stock, even as late as November, 1982, when judgment was finally entered. The fact that the stock may have been worth more at that time than it was worth in June, 1978, would have been of no consequence; Kalb would have had it restored to him at its current value, and Vega would have had no claim of set-off because of its increased value. Moreover, because such a restoration would have been necessarily indicative that Kalb was entitled to the stock throughout the whole period—that because of the fraud Vega never had a proper claim to it—Kalb's failure to prove the precise value of the stock in June, 1978, would also have been inconsequential. So long as he proved *some* damage, sufficient to establish the underlying fraud, and sought rescission rather than damages, the actual value of the stock at the time of its sale to Vega would have no relevance.

Kalb's election to proceed for rescission of the sale was defeated by the voluntary action of Vega. By selling the stock to Fischer, and thus enabling the further sale to a secondary bona fide purchaser, Vega made it impossible for Kalb to retrieve the stock through rescission; and it is on that account that Kalb was forced to seek damages for conversion. *Cf. Calvert Bldg. & Const. Co. v. Winakur,* 154 Md. 519, 537 *et seq.,* 141 A. 355 (1928). We therefore must examine the law relating to conversion, for which the normal action is trover.

Conversion has been generally defined as the wrongful exercise of dominion by one person over the personal property of another. *Interstate Insurance Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954); and the well-established measure of damages in such a case is the value of the property *at the time of conversion,* plus interest. *See Herzberg v. Adams,* 39 Md. 309, 313 (1874); *Checkpoint v. Sweeney,* 250 Md. 251, 242 A.2d 148 (1968); *Staub v. Staub,* 37 Md.App. 141, 376 A.2d 1129 (1977). The question, then, is when did the conversion occur?

■ Initially, the Court of Appeals spoke of conversion as the wrongful *taking* or asportation of a chattel with the intent by the taker to appropriate it to his own use. *See Harker v. Dement,* 9 Gill 7, 17 (1850). Later cases, however, have made clear that the gist of the tort is not necessarily the manner of acquisition of the property by the defendant, but rather his wrongful exercise of dominion over it. *See Kirby v. Porter,* 144 Md. 261, 125 A. 41 (1923); *Saunders v. Mullinix,* 195 Md. 235, 72 A.2d 720 (1950). That may involve nothing more than the improper withholding of the property from the rightful owner; it may also be found to occur, however, when the person in possession destroys, modifies, or sells the property, those acts being inconsistent with the owner's rights in the property and, at least implicitly, a clear denial of those rights. *Saunders v. Mullinix, supra,* 195 Md. 235, 72 A.2d 720; *see also Merchants' Bank v. Williams,* 110 Md. 334, 72 A. 1114 (1909); *Martin v. Lanahan,* 133 Md. 525, 105 A. 777 (1919).

■ What we have here, in effect, are three separate and successive acts by Vega, each of which could, under the evidence, have constituted à tortious conversion. The first was the fraudulent *acquisition* of the stock, for which an action in trover may have been possible. *See Baird v. Howard,* 51 Ohio St. 57, 36 N.E. 732 (1894); 89 C.J.S. *Trover & Conversion,* § 41. The second was Vega's refusal to *return* the stock after Kalb's demand that he do so, which was tantamount to a withholding of the stock from its rightful owner. The third was Vega's sale of the stock to Fischer, which not only represented a wrongful exercise of dominion over the stock, but the one clear and final act that effectively put the stock beyond Kalb's reach.

The fact that Kalb may have been able to treat either or both of the first two acts as actionable conversions should not, and, in our judgment, does not, serve to preclude his treating the third act also as a conversion.

That, indeed, *was* the conversion for which recovery ultimately was sought. That was the act which effectively

precluded Kalb from retrieving the stock at its then-current value. It therefore is consistent with both the legal measure of damages available in cases of conversion and basic fairness and equity that the recovery be based on the value of the stock at the time of its sale to Fischer. *See Saunders v. Mullinix, supra,* 195 Md. 235, 72 A.2d 720. That value *was* established; it was the purchase price paid by Fischer—$59,000.

Accordingly, we conclude that the court erred in awarding only nominal damages. A judgment should be entered in favor of Kalb for $53,000—the value of the stock at the time of its conversion, less the $6,000 paid by Vega, plus interest.

CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR MODIFICATION OF JUDGMENT IN ACCORDANCE WITH THIS OPINION; APPELLEE TO PAY THE COSTS.