720 A.2d 966

**MEDI–CEN CORPORATION OF MARYLAND**

v.

**H. Robert BIRSCHBACH, M.D., Chartered.**

**No. 27, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Nov. 30, 1998.

Robin G. Banks (Howard G. Goldberg and Goldberg, Pike & Besche, P.C. on the brief), Baltimore, for appellant.

Ronald L. Early (Lerch, Early & Brewer, Chartered on the brief), Bethesda, for appellee.

Argued before HARRELL, J., and JAMES S. GETTY, Judge (retired), Specially Assigned, and ESSOM V. RICKS, Jr., Judge, Specially Assigned.

HARRELL, Judge.

The genesis of this appeal is an action brought in the Circuit Court for Montgomery County by H. Robert Birschbach, M.D. Chartered (Dr. Birschbach), appellee, against Medi–Cen Corporation of Maryland (Medi–Cen), appellant. On 8 August 1996, Dr. Birschbach filed a complaint in the circuit court alleging breach of contract and conversion with regard to his share of accounts receivable that Medi–Cen had collected, or was to collect, from medical patients the doctor had treated.

Following a bench trial on 15 and 16 April 1997, the court entered judgment in favor of Dr. Birschbach in the amount of $81,739.04, plus prejudgment interest and costs. For purposes of the instant appeal, it appears that the $81,739.04 award was composed of two basic amounts: (a) $28,741.91, representing 50% of the face amount ($57,483.82) of uncollected accounts receivable for medical services rendered prior to contract termination (1 May 1996), and (b) $52,997.13, representing Dr. Birschbach's share of revenues collected, improper withdrawals, and refunds. As to that judgment, appellant raises in this appeal the following issue which we have rephrased, only as to component (a) of the award:

> Whether the trial court erred by awarding the sum of 50% of all outstanding, uncollected accounts receivable for services rendered prior to 1 May 1996.

## FACTS

On 29 January 1995, Dr. Birschbach, a physician specializing in internal medicine and gastroenterology, and Medi–Cen, a corporation specializing in administrative billing and marketing services, entered into an Associate Physician Membership Agreement (the Agreement). Pursuant to the Agreement, Medi–Cen was responsible, among other things, for billing and collecting payments from Dr. Birschbach's patients.[1] Medi–Cen deposited the proceeds collected in a bank account owned by Dr. Birschbach, but accessible by both Dr. Birschbach and Medi–Cen, as provided in the Agreement. As compensation for its performance pursuant to the Agreement, Medi–Cen was entitled to withdraw one-half of the collected funds from the bank account on the fifteenth day of each month. The remaining funds were Dr. Birschbach's.

In order to enable Medi–Cen to perform its billing and collection undertakings, Dr. Birschbach provided Medi–Cen's billing service, Health and Quality Management (HQM), with

---

1. Medi–Cen also provided Dr. Birschbach with various equipment and office supplies pursuant to the contract.

the raw data regarding the services and charges applicable to his patients. Dr. Birschbach kept no copies of this data.

On 26 March 1996, Dr. Birschbach gave Medi–Cen notice that he intended to terminate the Agreement, effective 1 May 1996. Medi-Cen accepted the termination. Both Dr. Birschbach and Medi–Cen assumed that, even after the effective date of termination of the Agreement, Medi–Cen would continue its billing and collection efforts for all services Dr. Birschbach had rendered prior to 1 May 1996 and for which he had provided raw data to HQM. For these services, Medi–Cen would continue to collect its 50% share for all of Dr. Birschbach's accounts receivable accrued, but unpaid, as of 1 May 1996.[2]

Although Medi–Cen continued collecting the accounts receivable, it did not remit to Dr. Birschbach the 50% portion to which he was entitled. In fact, Dr. Birschbach did not receive a payment from Medi–Cen after 30 April 1996.

On 8 August 1996, Dr. Birschbach filed a complaint in the Circuit Court for Montgomery County alleging breach of contract and conversion.[3] After conducting a bench trial on 15 and 16 April 1997, the court found that Medi–Cen had "entirely commandeered [the] accounts receivable as theirs, their property to do with whatever they wish[ed]." Although the court acknowledged that "[t]he record is silent as to whether or not [Medi–Cen] . . . ever collected any of that [sic] accounts receivable," the court found that the record was "not silent on the question on the amount of those accounts receivable, which is doubled $28,741.91." The court entered judgment in favor of Dr. Birschbach in the amount of $81,739.04, plus prejudgment interest and costs. As noted *supra,* the $81,739.04 award included $28,741.91, representing 50% of all outstanding

---

**2.** The Agreement did not provide a method for determining or estimating when accounts became uncollectible.

**3.** Dr. Birschbach's complaint also included a request for an accounting with regard to "all funds received by [Medi–Cen] arising from billings generated as a result of services provided by [Dr. Birschbach], and the disposition of such funds."

uncollected accounts receivable ($57,483.82) for services rendered prior to 1 May 1996.[4]

## STANDARD OF REVIEW

Maryland Rule 8–131(c) states:

*Action tried without a jury.* When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■ This Court's standard of review depends upon whether the lower court's ruling being scrutinized was a finding of fact or a conclusion of law. *Himelstein v. Arrow Cab,* 113 Md. App. 530, 536, 688 A.2d 491 (1997), *aff'd,* 348 Md. 558, 705 A.2d 294 (1998). "[T]he appellate court should not substitute its judgment for that of the trial court on its findings of fact but will only determine whether those findings are clearly erroneous in light of the total evidence." *Van Wyk v. Fruitrade,* 98 Md.App. 662, 669, 635 A.2d 14 (1994) (quoting *$3,417.46 U.S. Money v. Kinnamon,* 326 Md. 141, 149, 604 A.2d 64 (1992)). In contrast, the clearly erroneous standard does not apply to the trial court's determinations of legal questions or to the legal conclusions it draws from its factual findings. *Id.* (citing *Davis v. Davis,* 280 Md. 119, 124, 372 A.2d 231 (1977)). The appropriate standard of review in these instances is whether the trial court was legally correct. *Himelstein,* 113 Md.App. at 536, 688 A.2d 491.

## DISCUSSION

In order to resolve the parties' dispute as to whether the trial court's award to Dr. Birschbach of 50% of the face value of all outstanding, uncollected accounts receivable was correct,

---

4. Although the trial court did not specify whether its judgment was based on breach of contract or conversion, both parties conceded at oral argument before this Court that the trial court granted relief under the conversion count only.

we must examine three issues. Initially, we must determine a definition of "accounts receivable." Second, using this definition, we must analyze whether accounts receivable are property subject to conversion. Finally, if accounts receivable are subject to conversion, we must determine if the circuit court properly valued such property for purposes of the instant conversion action.

### A.

We can locate no Maryland cases defining what is an "account receivable." Accordingly, we have looked abroad for guidance. *Black's Law Dictionary* defines accounts receivable as:

> A debt owed to an enterprise, that arises in the normal course of business dealings and is not supported by negotiable paper. For example, the charge accounts of a department store. But income due from investments (unless investments are the business itself) is not usually shown in accounts receivable. A claim against a debtor usually arising from sales or services rendered; not necessarily due or past due.

*Black's Law Dictionary* 18 (6th ed.1990). Similarly, *Webster's Dictionary* describes accounts receivable as "a balance due from a debtor on a *current* account." *Merriam Webster's Collegiate Dictionary* 8 (10th ed.1993) (emphasis added). In *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912), the U.S. Supreme Court examined accounts receivable in the context of bankruptcy law. There, the Court described accounts receivable as "the amounts owing to [a debtor] on open account." *Id.* at 184, 32 S.Ct. 633. In *Chester v. Jones,* 386 S.W.2d 544 (Tex.Civ.App.1965), the Texas Court of Civil Appeals analyzed accounts receivable in calculating the amount owed in an accounting. The court described accounts receivable as "contractional obligations owing to a person on an open account." *Id.* at 547 (citing *Valley Nat'l Bank of Phoenix v. Shumway,* 63 Ariz. 490, 163 P.2d 676 (Ariz.1945); *West Virgi-*

*nia Pulp & Paper Co. v. Karnes,* 137 Va. 714, 120 S.E. 321 (1923)).

■ After carefully reflecting upon these definitions, we adopt a definition of "account receivable" as:

A balance due from a debtor on an open account, usually for services rendered or goods provided. Such a debt arises in the normal course of business dealings.

## B.

■ The tort of conversion is generally defined as "the wrongful exercise of dominion by one person over the personal property of another." *Kalb v. Vega,* 56 Md.App. 653, 665, 468 A.2d 676 (1983) (citation omitted). The measure of damages relating to a conversion is determined by the value of the property at the time of the conversion, plus interest. *Id.* Whether a conversion has occurred is not necessarily determined by the manner in which the defendant acquires the property, but rather his wrongful exercise of dominion over the property. *Id.* at 666, 468 A.2d 676 (citations omitted). As this Court stated in *Allied Investment Corp. v. Jasen,* 123 Md.App. 88, 100, 716 A.2d 1085 (1998) (citations omitted):

In determining the seriousness of the interference with the plaintiff's rights, the court should consider factors such as (1) the extent and duration of the defendant's exercise and control; (2) the defendant's intent to assert a right which is inconsistent with the plaintiff's right of control; (3) the defendant's good faith or bad intentions; (4) the extent and duration of the resulting interference with the plaintiff's right of control; (5) the harm done to the chattel; and (6) the expense and inconvenience caused to the plaintiff.

Although conversion may involve nothing more than the improper withholding of property from the owner, it may occur "when the person in possession destroys, modifies, or sells the property, those acts being inconsistent with the owner's rights in the property and, at least implicitly, a clear denial of those rights." *Kalb,* 56 Md.App. at 666, 468 A.2d 676 (citations omitted). The question before us in the instant case becomes

whether accounts receivable are personal property that are capable of being converted.

In *Lawson v. Commonwealth Land Title Ins. Co.*, 69 Md. App. 476, 518 A.2d 174 (1986), this Court examined whether the tort of conversion applies to recover a debt arising from an overpayment of money. In *Lawson*, Commonwealth Land Title conducted a settlement on the refinancing of real estate in which Mr. Lawson had an interest. *Id.* at 477, 518 A.2d 174. Due to its error, Commonwealth overpaid Mr. Lawson $3,966. *Id.* Mr. Lawson was paid by check, which he routinely deposited in his personal bank account. *Id.* Although Commonwealth explained its error to Mr. Lawson, he refused to return the money. *Id.* at 478, 518 A.2d 174. Subsequently, Commonwealth filed a complaint alleging conversion, unjust enrichment, and breach of an implied contract. *Id.* Lawson asserted that all three counts were time-barred under the applicable statute of limitations. *Id.*

After a non-jury trial, the trial court determined that none of the counts were time-barred and entered judgment for Commonwealth in the amount of $3,716. *Id.* at 478–79, 518 A.2d 174. In an unreported opinion, *Lawson v. Commonwealth Land Title Ins. Co.*, 66 Md.App. 802 (1986), this Court disagreed with the trial court, determining that all counts except for the conversion claim were in fact time-barred. *Id.* at 479, 518 A.2d 174. On remand, Lawson claimed "that the tort of conversion does not apply to the wrongful detention of money." *Id.* The trial court rejected Lawson's argument, however, and entered judgment for Commonwealth. *Id.*

On appeal once again, this Court reversed the judgment of the trial court. 69 Md.App. at 479, 518 A.2d 174. In finding that the conversion action was not available for the purpose of recovering a debt, we stated:

Most of the commentators agree that the tort [conversion] has, in recent times, made a two-stage leap beyond the bounds of chattels to permit recovery for the loss or deprivation of intangible property as well. In the first stage, the law came to regard the physical document evidencing an

intangible right—a promissory note, a stock certificate, a bank book, etc.—as itself a chattel capable of conversion. In the second, it merged the underlying intangible right with the document so that the injured owner could recover not just the nominal value of the document itself that was wrongfully withheld but also the value of the right evidenced or represented by the document.

*Id.* at 480–81, 518 A.2d 174. Because " 'there [was] no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness [did] not lie against the debtor.' " *Id.* at 482, 518 A.2d 174 (quoting *Lyxell v. Vautrin,* 604 F.2d 18, 21 (5th Cir.1979)).

In *Allied Investment Corp. v. Jasen,* 123 Md.App. 88, 93–4, 716 A.2d 1085 (1998), this Court examined whether a limited partnership interest was subject to conversion. In that case, DC Bancorp and Allied were originally assigned a partnership interest in Ashmere Partnership by William H. Miller as collateral for a $1,000,000 loan. *Id.* at 93–94, 716 A.2d 1085. Pursuant to a later agreement, however, Miller assigned his partnership interest in Ashmere Partnership to Jasen. *Id.* at 94, 716 A.2d 1085. Subsequently, a dispute arose over who was properly assigned Miller's partnership interest. *Id.* at 94–95, 716 A.2d 1085. Allied filed a complaint for declaratory judgment and accounting, asserting "that Jasen's 'antagonistic' claim to Miller's partnership interest in the Ashmere Partnership and his stock in the Ashmere Corporation 'clouded title to these assets, thereby impairing the value of Allied's property interests in Miller's partnership interest ... and ... stock.' " *Id.* at 95, 716 A.2d 1085. The trial court concluded that, although "the principal counts were titled as declaratory judgment claims, they were actually claims for conversion and thus time barred by the statute of limitations." *Id.* at 96, 716 A.2d 1085.

On appeal, agreeing that Allied's complaint was one for conversion, this Court examined whether such a claim could be made with respect to the limited partnership interest at issue. *Id.* at 101–05, 716 A.2d 1085. Relying on *Lawson,* we

"agree[d] that '[t]he process of expansion [of the law of conversion] has stopped with the kind of intangible rights which are customarily merged in, or identified with some document....'" *Id.* at 103, 716 A.2d 1085. Examining the limited partnership interest at issue, we determined that it was a Massachusetts limited partnership and "a certificate of limited partnership must be executed and filed in the office of the secretary of the state [of Massachusetts]." *Id.* at 104, 716 A.2d 1085. Thus, "Miller's intangible interest in the Ashmere Partnership was identified with and merged in a document, and ... this interest may be the subject of a suit for conversion." *Id.* at 105, 716 A.2d 1085.

Turning to the accounts receivable in the present case, we note from Dr. Birschbach's direct testimony the following colloquy:

Q: Dr. Birschbach, my understanding of the system was that after you saw a patient, you would fill out a billing information sheet that Medi–Cen would pick up from your office by courier and bring to its billing office. Am I correct so far?

A: That's correct.

Q: And then your understanding is that Medi–Cen would then generate a bill to a third-party payor like an insurance company and/or the patients themselves, correct?

A: That's correct.

Q: And that the monies that would come as a result of those bills that were generated would then be deposited into an account which you had established in cooperation with Medi–Cen at NationsBank, correct?

A: That's correct. There were two accounts, but essentially, most of my funds went into the primary account.

Later in Dr. Birschbach's testimony, the following discussion with the trial judge took place:

COURT: And so, I don't know what day of the week April 30, 1996 was, but let us assume it was a weekday.

Is it your testimony that when on that day whatever patients you had on April [sic] 30, 1996, you took raw data from them, correct?

A: Yes, sir.

COURT: Which would be the basis for billing?

A: Yes, sir.

COURT: And that was collected by somebody, right?

A: Prepared by me and sent to HQM for billing through April 30th.

During Medi–Cen's case-in-chief, the following discussion took place between the court and Dr. Clever, the Vice–President of Clinical Affairs for Medi–Cen, during his direct testimony:

COURT: Maybe I am missing something here, but I thought that through the date of March 31, 1996, everybody was happy, at least relatively happy, and the thing was working okay.

The doctor would get a patient. He would fill out the raw data. Your guy would come over and collect the raw data for the day, or the week, or whatever.

You would send that to the insurance carrier. The insurance carrier would send a check back. It would go into the doctor's account, and then you take half and he would take half. Is that right?

A: That's represented on the first line to the bottom [of Defense Exhibit 8] through March of '96, Medi–Cen balance to Dr. Birschbach. That's totally agreed upon.

Although Dr. Clever's answer referred to Defense Exhibit 8, which ultimately was not admitted into evidence, his verbal agreement with the court's verbal summary of the procedural aspects of the creation and documentation of the accounts receivable indicates that physical "raw data" existed evidencing those accounts, which raw data was compiled in the normal course of business for the purpose of getting paid for the medical services rendered by Dr. Birschbach.

Further hard copy evidence of the existence of the accounts receivable is found in Defendant's Exhibits 2, 3, and 9. During cross-examination, Dr. Birschbach testified that Defendant's

Exhibit 2 "is data that I sent regarding previous payments...." Upon our examination, Defendant's Exhibit 2 appears to contain, among other things, a record of claims paid on behalf of patients dating as far back as March 1995. Dr. Birschbach further testified that Defendant's Exhibit 3 reflected payments for care rendered prior to 1 May 1996. Within Defendant's Exhibit 3 are copies of checks paid to Dr. Birschbach on behalf of patients by various health insurance companies. Finally, on direct examination, Dr. Clever testified that Defendant's Exhibit 9 contained "a general ledger, dated May 13, 1996, which is an accounting of checks received, deposits made, on behalf of [Dr. Birschbach]...."

■ Although the evidence in the instant case does not clearly provide the type of singular "magic bullet" document present in *Allied Investment Corp.*, what does appear in the record strongly suggests the existence of such documents.[5] *See Allied Investment Corp.*, 123 Md.App. at 101–05, 716 A.2d 1085 (discussing " 'intangible rights which are customarily merged in, or identified with some document' "); *Lawson*, 69 Md.App. at 481, 518 A.2d 174. This issue, however, was not a focus of the proceedings below. Nonetheless, it does appear from the record that the accounts receivable were represented by hard copies or electronic data, kept in the normal course of business for that purpose, which would likely fulfill the requirement of *Allied Investment Corp.*. Because we are reversing and remanding the judgment in this case for the reason explained in (C) of our analysis, the parties and court can amplify the documentation issue on remand.[6]

---

5. The raw data concerning the accounts receivable in the present case differs from the check present in *Lawson* because, as we stated in that case, "[w]hen there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." 69 Md.App. at 482, 518 A.2d 174. Thus, in *Lawson*, we had a separate basis for concluding that conversion was inappropriate under its facts. Contrary to *Lawson*, the instant case does not involve a claim against a debtor for conversion of the funds representing the indebtedness.

6. Although this case involves raw data which was transferred using hard copy, we draw no distinction between hard copy and electronic

## C.

Having defined accounts receivable and determined that such accounts, if the documentation requirement is met, may be property subject to conversion, we must now examine whether the trial court appropriately valuated them in its award of damages. Medi–Cen argues that "the trial court awarded Birschbach a sum of money based on the totally speculative assumption that one hundred percent (100%) would be collected and, by virtue of the judgment rendered and interest accruing immediately thereon, the invalid proposition that it had, in fact, been collected." Because "the trial judge rendered [his] decision without any evidence or expert testimony of Medi–Cen's past history of accounts receivable collection or Medi–Cen's prospect for collecting the accounts receivable in the future," Medi–Cen asserts that it "is not a sufficient basis for an award of outstanding accounts receivable." We agree with Medi–Cen's argument. We are persuaded to reach this position by various foreign authorities, as we could find no Maryland case law on point.

*Collier on Bankruptcy* provides:

The courts have identified and utilized different methods of valuation suitable to various types of assets. Thus, notes or accounts receivable are not appraised at their face value but on the basis of prospect at the critical date of their collectibility within a reasonable time, depending on the solvency of the obligors, the presence or absence of a serious dispute over their validity or the availability of other defenses.

*Collier on Bankruptcy* § 102.32[4] (Lawrence P. King ed., 15th ed.1998) (citations omitted). Footnote 67 provides:

Although the value depends on the prospect of their collectibility, as it exists at the critical date, courts sometimes have relied on hindsight gained from the success or failure of

---

data retained on disks or other tangible form representing accounts receivable. The intangible interest which is allegedly converted (in this case the accounts receivable), however, must be identified with and merged in a document which is admissible under the Maryland Rules of Evidence.

subsequent efforts to collect exerted by either the debtor or the trustee in bankruptcy, especially in cases involving preferences.

*Id.* at § 101.32[4] n. 67 (citations omitted). Footnote 68 further provides:

Where the note or account is undisputed but its collectibility is doubtful, the courts have tried to determine whether or not it can be collected within a reasonable time, often by inquiry into the obligor's resources or reliance on witnesses experienced in similar businesses or acquainted with the debtor's transactions.

*Id.* at § 101.32[4] n. 68 (citations omitted). Finally, footnote 69 provides:

The existence of a serious dispute over the validity of a note or account has induced the court to either appraise it under a heavy discount or to disregard it in toto in the valuation process, presumably in order to avoid the necessity of going into collateral issues.

*Id.* at § 101.32[4] n. 69.

Courts have considered several factors in valuing accounts receivable in many different contexts. In *Neuger v. Casgar,* the Bankruptcy Court stated:

[A]ccounts receivable need not be taken at face value if circumstances cast doubt on their collectibility. The prospects of collection of such assets are evaluated in light of the past record of payment of the obligors, the obligors' current solvency, and the presence or absence of any dispute over the validity of the accounts or debts owed.

*Neuger v. Casgar (In re Randall Constr., Inc.),* 20 B.R. 179, 184 (Bankr.N.D.Ohio 1981). Similarly, in *Clark v. Clark,* which involved the valuation of the stock of a medical professional corporation in a divorce proceeding,[7] the Court of Appeals of Kentucky stated:

---

**7.** Later in this opinion we distinguish the instant case from *Hetrick v. Smith,* 67 Wash. 664, 122 P. 363 (Wash.1912), on the basis that *Hetrick,* among other things, involved stock valuation rather than the valuation

[T]he appellee's expert, considered the collectibility of the corporation's past accounts receivable and, based on those values and records, calculated the value of the corporation's current accounts receivable. He also considered the current value of the corporation's inventory, equipment, and insurance short-term value. This method was more reflective of the true value of the corporation's assets. The trial court certainly did not err in adopting this valuation approach.

*Clark v. Clark,* 782 S.W.2d 56, 59 (Ky.Ct.App.1990). In *Constructora Maza, Inc. v. Banco de Ponce,* the First Circuit examined certain transfers of assets made preceding the filing of a bankruptcy petition. The court held:

The prospects of collection of [accounts receivable] are evaluated in light of the past record of payment of the obligors, the obligors' current solvency, and the presence or absence of any dispute over the validity of the accounts or debts owed. Because the value of such assets may, in certain circumstances, be discounted, it is appropriate for the trier of fact to hear qualified opinion testimony on their fairly realizable value.

*Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 577 (1st Cir.1980) (citations omitted); *see also Mack v. Bank of Lansing,* 396 F.Supp. 935, 941 (W.D.Mich.1975) (stating that "[o]pinion evidence as to the value of accounts receivable is admissible where the witness is shown to be qualified by his experience and general information concerning the trade in which the debtor was engaged to form an opinion as to the fair value of the obligations").

In *Chester v. Jones,* 386 S.W.2d 544 (Tex.Civ.App.1965), the Texas Court of Civil Appeals examined the valuation of the accounts receivable of a medical practice. In *Chester,* Dr. Jones brought suit for an accounting of benefits under the

of accounts receivable, *see infra;* however, such a distinction does not apply to *Clark.* Although *Clark* involved stock valuation, which, as stated *infra,* is more attenuated from accounts receivable valuation, the court in *Clark* nonetheless looked to the collectibility of accounts receivable as a factor in valuating the stock.

terms of a written contract by which he was associated with defendants in the practice of medicine. *Id.* at 544. After terminating his association with the practice according to the terms of the contract, Dr. Jones sued for damages for wrongful discharge and sought to receive benefits specified in the contract, including accounts receivable. *Id.* at 545. The trial court granted summary judgment in favor of the medical practice and Dr. Jones appealed. *Id.* at 546. On appeal, the Texas Court of Civil Appeals reversed and remanded the case, determining that Dr. Jones's discharge was in full accordance with the terms of the contract, and not a wrongful discharge. *Id.* On remand, the trial court awarded Dr. Jones his proportionate share of the accounts receivable pursuant to the terms of the contract. *Id.* The trial court based its calculation of Dr. Jones's share of the accounts receivable on the total amount of accounts receivable owed to the clinic rather than the amount which had been collected at the time of the suit.[8] *Id.* at 547.

On appeal from that judgment, the Court of Civil Appeals examined whether the value of accounts receivable should "be calculated on the cash basis of the total amount of the accounts receivable, regardless of collectibility, or whether [Dr. Jones's] percentage of the accounts receivable is to be calculated on the accounts which had in fact been collected at the time of the suit." *Id.* at 547. Analyzing relevant portions of the contract,[9] the court determined that "[i]f the total of the

---

**8.** Paragraph 11 of the contract in *Chester* provided that "such party, his heirs, executors, or assigns shall be entitled to a proportionate share of the total of all accounts receivable then carried on the books of THE CHESTER CLINIC which have not been outstanding for more than three years immediately preceding such death, disability or retirement." *Id.* at 546. In making its judgment, the trial court followed a formula provided by the contract and based its award to Dr. Jones on the total outstanding amount of accounts receivable within this three-year period. *Id.*

We note that the Agreement in the instant appeal before us contains no such provision addressing a method for valuation of accounts receivable as existed in *Chester*.

**9.** Although the court was examining the terms of the contract as applied to the accounts receivable, its rationale can be applied to this

accounts receivable [was] in fact collected, then [Dr. Jones] would have been entitled to the amount awarded by the trial court. We cannot say, however, that the dollar value of an 'account receivable' can be ascertained until it has been determined whether the account receivable is collectible." *Id.* Thus, the collectibility of the accounts receivable had to be determined in order to value properly the accounts receivable.

In the present case, the trial court awarded 50% of all outstanding, uncollected accounts receivable for services rendered by Dr. Birschbach prior to 1 May 1996. To reach this award, the court necessarily assumed that the accounts receivable were collectable fully. In making its decision, the court stated:

> The record is silent as to whether or not [Medi–Cen] have ever collected any of that accounts receivable, but then the record is not silent on the question on the amount of those accounts receivable, which is doubled $28,741.91, whatever that number is.

> And the only way, given the history of this case, it seems to me that the plaintiff here, has solaced, to be able to collect on that money, as to make it part and parcel of this case, which he has done.

> So I find, in favor of the plaintiff, in the amount of $28,741.91....

■ Because the record failed to contain any evidence regarding the collectibility of the accounts receivable, the court did not have a sufficient basis to award Dr. Birschbach

---

case because the Texas court ultimately determined that the contract did not provide that Dr. Jones's share of accounts receivable awarded under Paragraph 11 be converted to cash. In its holding, the court stated:

> If the parties to the contract had intended that the share of 'accounts receivable' awarded to appellee under Paragraph 11 be converted to cash, or cash value at the time of the disassociation, they could have simply so provided therein. The language used does not justify the award to appellee of the 'money value' of such accounts receivable. *Id.* at 547–48. Thus, the ultimate value of the outstanding accounts receivable was not controlled by the terms of the contract.

50% of their face value. The plaintiff bears the burden of proof as to the amount of damages. *Ruiz v. Wolf et al.,* 250 Ill.App.3d 121, 190 Ill.Dec. 198, 621 N.E.2d 67, 69 (Ill.App.Ct. 1993); *Terrell v. Tschirn,* 656 So.2d 1150, 1154 (Miss.1995). "In a suit for conversion, the value of the personal property at the time and place of conversion must be shown to prove the extent of damages." 656 So.2d at 1154 (citations omitted). In this case, Dr. Birschbach presented no evidence that the accounts receivable were 100% collectible. Without such evidence, and with the burden of proof resting with Dr. Birschbach, the trial court had no basis to award him 50% of the total outstanding accounts receivable.

At oral argument before us, Dr. Birschbach argued that *Hetrick v. Smith,* 67 Wash. 664, 122 P. 363 (Wash.1912), supports his assertion that he should receive 50% of the total outstanding accounts receivable. In *Hetrick,* Maud Hetrick brought suit for an accounting of the value of the capital stock of Maud I. Hetrick, Inc. *Id.* Ms. Hetrick claimed that Charles Smith held the capital stock in trust for her and that he had converted it to his own use. *Id.* After a bench trial, the trial court found in favor of Ms. Hetrick, determining that Charles Smith, while acting as attorney and legal advisor for Ms. Hetrick, wrongfully converted 99 shares of capital stock of the corporation he held in trust for her. *Id.* 122 P. at 364.

On appeal, the Supreme Court of Washington examined the trial court's valuation of the converted stock. *Id.* 122 P. at 365.[10] In determining the stock value, the court analyzed the corporation's assets, which included accounts receivable, as well as its liabilities. *Id.* The court found that, "[a]s to the accounts receivable, [Mr. Smith], having converted them and notified [Ms. Hetrick] not to attempt any collection thereof, should be charged with them at their face." *Id.* Thus, the court awarded Ms. Hetrick their full face value. *Id.*

---

**10.** The court also examined the trial court's finding that Mr. Smith had converted the stocks, and whether there was a sufficient showing that the stock was the separate property of Ms. Hetrick so as to enable her to maintain the action. *Id.* at 667, 672.

*Hetrick* is distinguishable from the present case. Although the court in *Hetrick* awarded the full face value of the accounts receivable, it only did so in the context of valuing stock which had been converted based on the corporation's assets and liabilities. *Id.* 122 P. at 365. Unlike the present case, *Hetrick* did not involve valuating accounts receivable which had been converted; rather, it involved valuating stock which had been converted. The value of the accounts receivable was only a factor used by the court in determining the corporate stock value. Thus, the valuation of the accounts receivable accepted by the court in *Hetrick,* in the overall analysis of the main objective in that suit, was more attenuated than in the present case. Further, the court in *Hetrick* afforded spare reasoning in its analysis of the accounts receivable for acceptance of a face value valuation approach. In its opinion, with regard to the value of the accounts receivable, the court stated:

> As to the accounts receivable, the appellant, having converted them and notified the respondent not to attempt any collection thereof, should be charged with them at their face.

*Id.* at 671, 122 P. 363. Other than this single sentence, no analysis concerning the valuation of the accounts receivable appears within the court's opinion. We are unpersuaded, therefore, to adopt the approach in *Hetrick* in the face of the better reasoned and numerous authorities discussed *supra.*

Finally, Dr. Birschbach relies on *Restatement (Second) of Torts* § 242 (1965), as "[f]urther support for recovery of the full value of the accounts receivable." The *Restatement (Second) of Torts* § 242 (1965), states:

### § 242.   Conversion of Documents and Intangible Rights

(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.

(2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document

is subject to a liability similar to that for conversion, even though the document is not itself converted.

*Id.* Although § 242 might be applicable to the accounts receivable in the present case, it nowhere states, either expressly or implicitly, that the full face value of such documents and intangible rights will be awarded for their conversion. Section 242 only states that "the damages include the value of such rights." *Id.* Thus, § 242 provides no method for valuing such rights, contrary to Dr. Birschbach's assertion.

■ None of the cases to which we were directed by the parties or discovered on our own attempt to set forth a bright line test to use in determining how to value accounts receivable. From these cases, however, we extract the observation that courts should consider the collectibility of accounts receivable, and from that, determine the value of the accounts receivable. Ultimately, the value of accounts receivable are based on the collectibility of the particular accounts at issue. Their collectibility normally depends on the solvency of the obligors, the presence or absence of a serious dispute over their validity, and the availability of other defenses. Inquiry into the obligor's resources may also be useful, as well as testimony from witnesses experienced in similar businesses or acquainted with the debtor's transactions. Experts may be useful in considering the collectibility of the holder's past accounts receivable and, based on those values and records, calculating the value of the holder's uncollected accounts receivable.

In mentioning these factors, we are not providing an exhaustive list. Any competent and admissible evidence tending to shed light on the collectibility of accounts receivable might be relevant and material. We hasten to add that we should not be understood to say or imply that accounts receivable are never capable of being found to be 100% collectible, provided the evidence supports such a conclusion.

At oral argument, both parties conceded that further proceedings regarding the appropriate measure of damages as to the uncollected accounts receivable would be appropriate

should we conclude, as we have, that the trial court's valuation of the accounts receivable was unsupported. This is a fit and reasonable concession in light of the apparently new Maryland case law fashioned in this opinion. As the parties made no assertions on appeal that other aspects of the monetary award were erroneous, we see no purpose on remand in delving into areas other than that addressed in this opinion.

JUDGMENT AS TO DAMAGES REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.